## RAND v. UNITED STATES.
### No. 10115.

Circuit Court of Appeals, Eighth Circuit.
April 23, 1935.

James E. O'Brien, of Des Moines, Iowa, for appellant.

C. I. Level, Asst. U. S.. Atty., of Denison, Iowa (E. G. Moon, U. S. Atty., of Des Moines, Iowa, on the brief), for the United States.

Before GARDNER, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

GARDNER, Circuit Judge.

Appellant was jointly indicted with three other persons in an indictment containing three counts. The first count charges the defendants named in the indictment with unlawfully, willfully, knowingly, and feloniously having in their possession and under their custody and control one certain still, together with all necessary attachments and adjustments essential to the operation thereof, and with having neglected to register the same, which still was capable of, and was intended and designed by the defendants for, the unlawful production of distilled spirits, to wit, alcohol, to be used for beverage and commercial purposes.

Count 2 charges the defendants with knowingly, willfully, unlawfully, feloniously, and fraudulently making and causing to be made, and fermenting and causing to be fermented, 33,000 gallons of mash fit for distillation and for the production of spirits and alcohol, in a building on premises described other than a distillery duly authorized according to law.

Count 3 charges that the defendants continuously throughout the time extending from February 1, 1934, to April 13, 1934, unlawfully, willfully, and feloniously conspired, combined, confederated, and agreed together and with each other to violate sections 281, 282, 284, and 307 of title 26 of the United States Code Annotated, in that they would commit divers offenses of having in their possession and under their control the certain still described in the indictment, and that said still would not be registered as provided by law, and of making and causing to be made, and fermenting and causing to be fermented, large quantities of mash fit for distillation and for the production of spirits and alcohol. Under this count seven overt acts are charged.

Appellant interposed a demurrer to the indictment which was overruled, and on trial he was found guilty on all three counts of the indictment. From the judgment and sentence entered on the verdict of guilty he prosecutes this appeal, alleging that the court erred (1) in overruling his demurrer to the indictment; (2) in denying his motion for a bill of particulars; (3) in denying his motion for directed verdict; (4) in overruling his objections to certain evidence; (5) in the giving of certain instructions to the jury.

In his challenge to the indictment, it is contended that counts 1 and 2 are duplicitous because they cover offenses described in the Internal Revenue Act and also offenses described in the National Prohibition Act (27 USCA § 1 et seq.). The short answer to this contention is that the National Prohibition Act became inoperative upon the adoption and ratification of the Twenty-First Amendment to the Constitution of the United States. United States v. Chambers, 291 U. S. 217, 54 S. Ct. 434, 78 L. Ed. 763, 89 A. L. R. 1510. The repeal of the Eighteenth Amendment was consummated on December 5, 1933. Dillon v. Gloss, 256 U. S. 368, 41 S. Ct. 510, 65 L. Ed. 994. With the ratification

of the Twenty-First Amendment, the Eighteenth Amendment became inoperative, and the National Prohibition Act, in so far as it was dependent upon the Eighteenth Amendment, became inoperative. As the offenses charged in the indictment are alleged to have been committed in February and April, 1934, there is no basis for the alleged duplicity. The demand for bill of particulars was also based upon the erroneous assumption that the indictment charges offenses under both the Internal Revenue Act and the National Prohibition Act. It was therefore properly denied.

It is also urged that section 281, title 26, USCA, under which count 1 of the indictment is drawn, was repealed by the enactment of the National Prohibition Act (27 USCA § 1 et seq.). United States v. Yuginovich, 256 U. S. 450, 41 S. Ct. 551, 65 L. Ed. 1043. These laws, however, were revived by the supplemental Prohibition Act of November 23, 1921 (42 Stat. 222), and were therefore in full force and effect at the times charged in the indictment. United States v. Stafoff, 260 U. S. 477, 43 S. Ct. 197, 67 L. Ed. 358.

The substantial question in this case is that which arises from the denial of appellant's motion for a directed verdict; in fact, the rulings of the court on the admissibility of evidence which are challenged by appellant are dependent upon whether there was substantial evidence of a conspiracy as charged in the third count of the indictment. If there was sufficient evidence to take that issue to the jury, then the court did not err either in its rulings on the admissibility of evidence or in its instructions to the jury. We therefore pass to a consideration of that question.

It is not essential that evidence of the conspiracy be first received as a condition precedent to the admissibility of evidence showing the participation of a defendant, though it is often desirable in order to render such evidence intelligible. The essence of such a conspiracy as here charged is an unlawful agreement to violate a criminal statute. It is rarely susceptible of direct proof, but must be established by circumstantial evidence, and proof of overt acts may be considered with other evidence and circumstances in determining whether such a conspiracy exists. Safarik v. United States (C. C. A. 8) 62 F.(2d) 892, 896; Goode v. United States

(C. C. A. 8) 58 F.(2d) 105, 107; Feigenbutz v. United States (C. C. A. 8) 65 F.(2d) 122, 124.

In Safarik v. United States, supra, it is said: "It does not necessarily follow that there must be direct evidence of the existence of the conspiracy wholly disconnected with the evidence of the commission of the overt acts. A conspiracy is rarely proven by direct evidence, but must be established ordinarily by circumstances. If this proof was sufficient to establish an unlawful agreement, either express or implied, and the participation therein by the defendants with knowledge of the agreement, then it was proper to deny defendants' motion for a directed verdict on the conspiracy count. The overt acts may properly be considered with other evidence in determining whether a conspiracy exists; and, where the overt acts are of the character which are usually, if not necessarily, done pursuant to a previous scheme and plan, proof of the acts has a tendency to show a pre-existing conspiracy, so that when proven they may be considered as evidence of the conspiracy charged."

In Goode v. United States, supra, it is said: "The agreement need not be in any particular form, but it is sufficient that the minds of the parties met understandingly. A mutual implied understanding is sufficient so far as the combination or confederacy is concerned; and, in fact, the agreement is generally a matter of inference, deduced from the acts of the persons accused, which are done in pursuance of an apparent criminal purpose."

In Feigenbutz v. United States, supra, the opinion in which was written by Judge Van Valkenburgh, it is said:

"Conspiracy is an offense which can ordinarily be established only by a great number of apparently disconnected circumstances. Necessarily the existence of the conspiracy in most cases can be made to appear only inferentially from the acts of the parties committed in furtherance thereof. * * *

"For this reason much latitude is allowed to the discretion of the trial court in determining the order in which testimony having the ultimate tendency to prove the conspiracy may be introduced, the crucial requirement being that the existence of a conspiracy, as laid, must be satisfactorily established before the overt acts alleged may be permitted to play their jurisdictional part in the consummation of the offense charged."

It appears from the record that about the 1st of March, 1934, two men drove to the farm residence of Daniel Clark, Sr., located about a mile and a quarter from Bevington, Warren county, Iowa, and there negotiated for a lease of a barn. Clark proposed to rent the barn to these men for $100 a year, but the men protested that this was not sufficient, and agreed to pay at the rate of $35 a month, and later Clark received rent pursuant to this agreement. There was then secretly installed in this barn, which was located off the public highway, a mile from the nearest house, large stills and elaborate equipment for the manufacture of intoxicating liquor. At the time of the arrest of the defendants, there were eleven truckloads of this equipment, including 8,000 pounds of sugar, 10 one-gallon cans commonly used for alcohol, 50 one-gallon steel drums, 3½ barrels of molasses, 200 pounds of yeast, 1 still of three sections, 1 still of five sections, 1 condenser 8 feet high by 2 feet in diameter, 2 galvanized water tanks 3 feet wide, 2 feet high by 9 feet long, one 50-horse power steam boiler, 1 steam recooker, with various pumps, tanks, vats, and other equipment. In these wooden vats there were about 33,400 gallons of mash.

Various men were seen in and about this barn from time to time. The equipment was all installed and connected ready for operation; the mash was in process of fermentation. Clark, Sr., who was a reluctant witness for the government, among other things testified with reference to the premises: "I saw plenty at the barn. In between those two dates someone might have inquired if the neighbors were talking. I was gone about every day, except Sunday. I think that man there did talk to me once. Pete is his name. Well, Pete asked me how the people were around there, how they were generally. I told him they were O. K. He might have asked about the sheriffs. Yes, he asked me how the sheriff was. I never knew the sheriff of Madison County. I knew the sheriff of Warren County. I knew he was all right, and he is all right yet. I think Pete Rand came to my house once and talked about those reports. My signature is on Exhibit K. The boy gave all the information. It is the boy's statement that Pete Rand came to my farm during the remainder of March and the first thirteen days in April on an average of

once a week, some weeks not at all and some two or three times. I guess the statement was read to me at the barn. Twice is all I ever saw Pete Rand there."

The witness, referring to the appellant coming to his house, testified: "I don't know what Mr. Rand was there for. He bought some eggs and chickens from my wife. I don't know whether he bought anything from these fellows that rented the barn. He didn't say why he wanted to know how the people were around there, or why he wanted to know how the sheriff was. Pete Rand asked about the neighbors, wanted to know, I guess, if they were a good kind of people. I didn't inquire why he should ask about the Sheriff."

Daniel Clark, Jr., testified, among other things, as follows: "I went down with my father about ten o'clock that night, and he paid him $50.00. At different times I saw eight or nine men there. Several days after the place was rented I saw the man sitting in the court room whom you say is Pete Rand, at the barn. He was sawing a board. I believe I mentioned to him something about it being an enormous place and he said it wasn't all there yet. I talked to Pete Rand about the equipment. He came to our home during this time. From March to April 13th he was there perhaps eleven or twelve times at our home. He asked about the people around there, if they were all right. Sometimes he bought eggs. It was quite a while after they started to work in there that they put this chain and padlock on the gate."

Again referring to the appellant, the witness testified: "Sometimes he came to buy eggs and if there were any strangers he would inquire about them. There were eight or nine men at different times at the barn. When I saw Rand he was doing carpenter or repair work or these other times like a cook or man in charge of the food for a gang of workmen."

Again, referring to seeing the defendant at the barn, the witness testified: "When I saw him there, there were pumps there, but I don't know just what else. I made some remark about what was in there, and he said that was not near all of it."

Appellant did not take the witness stand, and whatever is said with reference to his acts and doings is neither contradicted nor explained. The possession, maintenance, and operation of this still was violative of the law. The plant could not with impunity be maintained and operated openly, and the enterprise necessitated the co-operation of a group, and it appears that from time to time there were some eight or nine different men seen in and about this plant. Among those who seem to have had business in and about the premises was the appellant. He was seen at work in the barn, and he explained that the equipment had not yet at that time all been installed. He from time to time came to Clark's for food for those who seemed to be occupied at the plant. This barn was off the highway, a mile distant from the nearest house, and a successful operation of the plant necessitated keeping a lookout and knowledge of the rumors and gossip that might be going on in the community. The gateway in the fence inclosing the barn was kept fastened by means of a chain and padlock. The very acts of the installation, possession, and maintenance of this plant in violation of law necessitated the joint and concurrent action of a group working secretly to further an unlawful purpose. It could not have been accomplished by a single person, and it remains to consider the evidence of appellant's participation therein. The very physical facts are persuasive evidence of the existence of a conspiracy, and there is no evidence that any one directed him in anything that he was doing. He was securing food supplies for the men; he was apparently constantly at the premises; and he was gathering information about the people of the community. He displayed an interest in all strangers and in the sheriff of the county. No one was more conversant with the nature of the enterprise than he; no one was more concerned in its success; no one took greater precautions to protect it. He alone seems to have informed himself as to the attitude and sentiment of the people in the community and of the law-enforcing officers. He knew that the enterprise was an outlaw, and that all who participated therein were committing a crime.

It is said in appellant's brief that he was a resident of Des Moines. If so, it is somewhat strange that he should be spending his time in the vicinity of this barn, interesting himself in the purchase of food for the men at the barn, and displaying great concern about the sentiment of the people in the vicinity of this equipment. There is no evidence that he had ever lived in that community until this barn was converted into a distillery.

The evidence of the acts and doings of the appellant and all the surrounding facts and circumstances were sufficient to warrant the jury in finding that there was a conspiracy as charged in the indictment, and that he participated therein. Proof of the offenses charged in counts 1 and 2 stands undisputed, and, as the proof was sufficient to warrant the jury in finding that the appellant participated therein, and that there was a conspiracy as charged, the court properly denied appellant's motion for a directed verdict.

Error is assigned in the giving of instructions 5 and 12, but we are clear that there was no error in the giving of either of these instructions, and the exception is not seriously urged in appellant's brief, nor referred to in oral argument.

The judgment appealed from is therefore affirmed.