McNEIL v. UNITED STATES.

No. 6610.

United States Court of Appeals for the District of Columbia.

Argued June 1, 1936.

Decided July 13, 1936.

R. H. McNeill, of Washington, D. C., for appellant.

Leslie C. Garnett, U. S. Atty., and John J. Wilson, Asst. U. S. Atty., both of Washington, D. C.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

GRONER, Associate Justice.

Benedict M. McNeil was indicted at the April, 1933, term with Robert S. Stunz and Alexander McNeil under the conspiracy statute (section 37, Criminal Code, 18 U.S. C.A. § 88). The indictment was in two counts; the first charging that the three named conspired to commit the offense of grand larceny; the second, to commit the offense of embezzlement. Appellant was assistant cashier of the Park Savings Bank from February 1, 1925, to August 13, 1929. Stunz was the executive vice president of the bank until it was closed by the so-called bank holiday in 1933. Alexander McNeil, the father of appellant, was a customer and depositor in the bank during all of the period mentioned in the indictment. Stunz admittedly embezzled approximately $2,000,-000 of the bank's money, and committed suicide March 14, 1933. Alexander McNeil died February 16, 1934. Appellant was subsequently tried alone, and found guilty, November 25, 1935, on both counts of the indictment. His motion for a new trial was overruled, and this appeal taken.

There are 68 assignments of error. Some are abandoned, and those not abandoned may be properly combined under the following general headings:

First, those relating to the admission and exclusion of evidence, oral and documentary, including the admission of evidence without first having shown the existence of the conspiracies, and including also the insistence of appellant that the testimony of the government's accountant expert witness was erroneously admitted.

Second, the refusal of the trial court to require the United States to elect as between the two counts of the indictment.

Third, the refusal of the trial court to direct a verdict of acquittal.

Fourth, those relating to the trial court's granting certain of the government's instructions and rejecting certain of appellant's instructions.

Park Savings Bank was an Alabama banking corporation doing a banking business exclusively in the District of Columbia. After the general bank closing order of March, 1933, it was examined and found to be insolvent, and in due time the Comptroller of the Currency took charge of the bank and appointed a receiver. The elder McNeil, the father of appellant, was engaged in the real estate business in Washington City; and it was the theory of the prosecution that, beginning as far back as February, 1925, the conspiracies were formed between the appellant, his father, and Stunz to obtain illegally and improperly the funds of the bank, and that these conspiracies continued until the closing of the bank in 1933.

The theory of the defense was that there was no proof of conspiracies between appellant, his father, and Stunz.

Twelve overt acts are charged, and are the same in each count of the indictment. The first act charged is that on October 8, 1930, the defendants McNeil (both father and son) drew on the elder McNeil account in the bank and caused the account to be overdrawn in the sum of $267. The next, that on February 18, 1931, Stunz caused a fictitious credit of $845.93 to be placed to the McNeil account. The remaining 10 overt acts follow the same course; that is to say, first an overdraft and then a fictitious credit. The final overt act charges that on March 3, 1933, defendants McNeil caused the McNeil account to be overdrawn $823.02, which was the amount of the overdraft when the bank closed. The larceny and embezzlement are charged in the amount of $50,000.

To sustain its case the government relied principally upon the witness Sauer, an expert accountant attached to the Federal Bureau of Investigation. He was produced to prove that sundry deposits made in the McNeil account were fictitious and that the bank received nothing on account thereof. All the books, records, vouchers, and accounts of the bank had been turned over by the receiver to Sauer, and his testimony was based entirely on the records. The books, slips, work sheets, etc., were either introduced or identified by witnesses employed in the bank and who kept the records; and they were available to appellant's counsel during the trial.

There was testimony of but two declarations. One, a letter found in Stunz's desk at the bank after his suicide. That letter, dated February 28, 1933, and addressed "To Whom it May Concern," stated that "no person now employed in the bank is responsible for any irregularities. I, alone, am responsible." The other was the testimony of Sauer that appellant admitted to him that the items which the government contends were fictitious, and which appear on the books of the bank in the McNeil account, were items from which he (appellant) benefited personally and from which also Stunz benefited personally. Aside from these, there is nothing to show any pre-existing, continuing conspiracies, except the nature of the transactions relied upon by the government. Two of the most typical and less devious of these, though not charged as overt acts, are helpful in explaining the method which it is claimed the conspirators adopted to rob the bank. Both occurred while appellant was still at the bank.

On May 25, 1929, the McNeil account was overdrawn $869.53. It continued overdrawn thereafter until June 22, 1929, at which time it was overdrawn $8,285.76. About the same date appellant's personal account was overdrawn $499.57. On June 22d, $9,500 was deposited to the A. McNeil account and $500 to appellant's personal account, thus wiping out the overdrafts. Appellant claims that the $10,000 used to make good the two accounts was drawn from the McNeil savings account. There was some testimony that such an account had been carried in the bank, and a former clerk in the bank testified that at one time it amounted to $10,000; but no records of it were found by those who examined the bank, and appellant offered no proof, such as a pass book—which, if one ever existed he should have had or known of or at least have been able to explain the loss of—to bear out his claim. The government, on the other hand, claims that the $10,000 was the fictitious withdrawal from a fictitious account in the name of one Robert P. Smith. To sustain this contention, the government introduced two deposit slips in appellant's handwriting; the one to the A. McNeil account for $9500 and the other to his own account for $500. These were dated June 17, 1929. (The

ledger sheets for these two accounts show no such deposits on this date.) The government also introduced a savings account card for the account of Robert P. Smith, showing a withdrawal on June 22d of $10,000, causing overdraft of the same amount, and a debit ticket (dated June 17, 1929) on the Smith account of $10,000 which was in appellant's handwriting. There never was any such Smith account in the bank, and appellant's explanation of his connection with the transaction is neither satisfactory nor convincing. He testified that the item was one of numerous items purporting to be the sale of first trust notes to Smith; that he knew Smith and knew he did not have a savings account at the bank; and that he knew that a debit ticket on a dummy account would be erroneous; but that if it were a "cash item" it would be a normal transaction for the bank to make out a debit ticket on a savings account which a customer did not have and carry the item in the cash drawer as a cash item. We understand this explanation to mean that the transaction would be a normal one if at the time it occurred Smith had deposited with the bank or sold to the bank deed of trust notes equal in amount to the debit item. The theory of the government, however, is that the whole transaction was fictitious; that it was neither more nor less than a bookkeeping arrangement whereby the $10,000 was taken out of an account which did not exist and credited to the account of the elder McNeil and to appellant's personal account, and that this unlawful result occurred through an agreement between Stunz, the elder McNeil, and appellant; and there is evidence, which we have not stopped to mention, showing Stunz's participation in the transaction. The dummy savings card and debit ticket were discovered, not in the files of the bank, but in an envelope in the basement of the bank in a section where appellant's other correspondence and papers were on file, and on the envelope was written in Stunz's handwriting, "B. McNeil—personal."

The other transaction to which we have referred as typical was of July 5, 1929, involving a deposit to the McNeil account of $14,000. A deposit slip for $14,000 to cover this deposit was in appellant's handwriting, and he testified that the deposit represented currency which he placed in the teller's drawer during the banking hours on the day of the date of the deposit slip. His explanation of his possession of the $14,000 is this: That he won the amount as a bet on a horse race on July 4, 1929 (the day before the deposit); that the name of the winning horse was Eskimo and paid odds of 13 to 1; that he had made the bet over the telephone (without depositing his end of the bet) with a bookmaker named R. G. Luber; that he did not know the odds at the time he made the bet but "that he just bet $1,000.00 on Eskimo and the horse won"; that the last address of Luber appellant had was Cavalier Apartments; that he had placed other bets with Luber and knew Luber's telephone number then, but did not remember it when he testified; that if the bet had been lost he could have paid the bookmaker because he had a little money at that time, about $2,600 of cash, in a safe deposit box at the bank; and that this latter sum was the profit from the sale of 200 shares of Wright-Aerial stock which he purchased at $42 a share and sold for $57 a share; and that the funds used to buy the stock were the funds of the bank. Appellant's income tax return was introduced and showed that his gross income for the year in question was $1,874.88. The government's theory of the method adopted to accomplish this deposit was that on that same day a savings account card and a debit ticket were made out to A. L. or A. G. Williams (one of the initials is uncertain), the savings card being made at Stunz's direction, and the debit ticket being made by appellant. The debit ticket shows that Williams' savings account was charged $14,000; the ticket containing the legend "first trust notes." Whether Williams had a savings account at the bank at the time is left in doubt, but the purpose of the government in introducing the ticket in appellant's handwriting was to show that this was an entirely fictitious transaction. And appellant, when he was asked about the legend, "first trust notes," replied that he knew nothing about them; and when he was asked if he intended this debit to be charged against the account of Williams, he replied, "I did not know anything about it." And the teller's machine card for the day's work (July 5, 1929) shows that the $14,000 which was credited to the McNeil account on that day appears not in the printed figures, but in pencil memorandum at the bottom of the column; the handwriting of the notation apparently being unknown.

The same difficulty exists, perhaps even in greater degree, in tracing the alleged

overt acts. For instance, Exhibit R. 11 (the McNeil account ledger sheet) shows that for some time prior to October 22, 1930, the account was overdrawn, and that on that day the overdraft was $845.93. The sheet for February 18, 1931, shows a deposit in this amount which wiped out the overdraft. Appellant's explanation of this transaction was that there was sufficient security deposited with the bank by McNeil & Co.—the security being mortgage notes on property in Canada—to take care of the overdrafts, and that Stunz authorized the credit and amply secured the bank against loss. The government's expert Sauer, on the other hand, testified that he had examined the bank records, including the head teller's settlement sheets for February 18th, and that the bank received no value whatever for the deposit. These various records were in evidence, but only the settlement sheet is in the record, and this merely shows the totals of the various tellers for the day. Enough appears, however, to show very clearly that the McNeil account, which as we have said was drawn on by both McNeils, was constantly overdrawn, sometimes in very large amounts, and that drafts to reimburse the account in some instances were made out on Canadian banks which came back and were redeposited for collection and came back again and again and again; and that ultimately the overdrafts were made good by deposits which the government's witness, by demonstration from the records of the bank, was evidently able to convince the jury were not real deposits but were, on the contrary, wholly fictitious and for which the bank never received anything of value. If the jury accepted the government's theory of the case, enough was proved to sustain a verdict of guilty. The transactions were either honest or they were fraudulent. If they were fraudulent, they could have been effected only through combination and agreement between the three indicted persons. We pass, therefore, to the specific assignments of error as classified in the early part of this opinion.

**First.** A. Appellant insists that the head teller's daily settlement sheets were not properly proved. These papers were parts of the records of the bank. They were proved by the persons in the bank who had control of them and who worked on them. They were sufficiently identified.

**B.** That the records of the bank were introduced in evidence in advance of showing a conspiracy. As we have pointed out, the government's case was not made up of declarations by the alleged conspirators but was grounded almost wholly upon documentary evidence to show that the bank had been defrauded by appellant and the others. This documentary evidence consisted of the ordinary records appertaining to the keeping of accounts in banking institutions, the records of overdrafts, and the records of deposits. The records of overdrafts consisted of checks drawn against the account in the handwriting of appellant and his father; and the record of deposits, of tickets covering the amount of the overdrafts. These records were, of course, not only proper, but imperative in the proof of a charge of this nature and, being properly identified as the regular records of the bank, were clearly admissible. It is, therefore, of no consequence that some of the records were prepared by a particular witness only in part and that others worked upon the same records. Each witness identified each record so far as it related to his work, and identified his own entries on it. The fact that made them admissible was that they were a part of the regular books of account of the bank, kept in the ordinary and regular way by employees of the bank, and that they contained the daily record of the business of the bank. They were admissible to show the method of conducting the business of the bank and, where they related to items charged as a part of the conspiracies, they were in each instance properly identified by the person who made the entry. It is true that as to many of the entries or items which are admittedly fictitious, the false figures were made or caused to be made by Stunz and not by appellant; but this was pointed out to the jury, and in every case of an alleged overt act there was evidence to show some knowledge or connection or benefit by appellant in the transaction. All of this documentary evidence was open to appellant who, from his long familiarity with the affairs and methods of the bank, was in position to explain his part and to show the jury that the conclusions of the expert witness were incorrect. And all of this was a question for the jury. The charge, like every charge of this nature, can only be proved by the books and daily work sheets of the bank, and their introduction, when identified, was not only proper but necessary. See United States v. Becker (C.C.A.) 62 F.(2d) 1007, 1010; Cullen v. United States (C.C.A.) 2 F.(2d)

524, 525; Lewis v. United States (C.C.A.) 38 F.(2d) 406; Massachusetts B. & Ins. Co. v. Norwich Pharmacal Company (C.C. A.) 18 F.(2d) 934.

Hence we do not think there is any substance to the point that the introduction of the records in advance of specific proof of the conspiracies was improper. There is rarely in a conspiracy case direct evidence of the conspiracy or proof of declarations. The evidence is nearly always circumstantial; and where such evidence is introduced disclosing conduct of persons charged with conspiracy which points to that unlawful end, it is permissible to produce it at any stage of the case. The obligation which the government assumes is to connect up the evidence so that when the case is submitted there is sufficient, when connected up, to show the guilt of the accused to the satisfaction of the jury beyond a reasonable doubt. Therefore, in all conspiracy cases great latitude in the introduction of testimony is allowed. It is enough that the evidence offered tends to elucidate the inquiry or to assist in determining the truth. Courts, as a general rule, do not reverse judgments because of the order in which testimony was received, or because some of it was irrelevant. Feigenbutz v. United States (C.C.A.) 65 F.(2d) 122, 124; Smith v. United States (C.C.A.) 267 F. 665; Rand v. United States (C.C.A.) 77 F.(2d) 52, 53.

C. There was no error in permitting the expert witness to give his conclusions to the jury as the result of his investigation and examination of the books. He was produced to show that he had examined the records of the bank to determine the deposits and withdrawals of money from the bank. The records from which he testified had been identified by other employees of the bank as part of the regular books of account of the bank. The books were in court, as well as the daily work sheets, which likewise had been properly identified; and the witness when asked to tell from the records whether or not in the particular instances charged, the instances being those in which deposits had been made to the McNeil account, the bank had received anything on account of these deposits, replied that it had not. In order to explain his answer to the jury, he traced the exact course of his examination through the books and records, showing in detail the grounds on which his opinion was based. There was no other way in which the facts could be shown. The records were pertinent evidence and the only evidence from which to determine the circumstances of deposits and withdrawals from the bank; and, in order that the items charged to have been fraudulent could be understood by the jury, it was necessary to have an accountant examine them and explain them as they were reflected in the bank's records. In such circumstances it is well settled that an expert may be called upon to make the computations and state them to the jury. Cooper v. United States (C.C.A.) 9 F.(2d) 216; Arine v. United States (C.C.A.) 10 F.(2d) 778; Lemon v. United States (C.C.A.) 164 F. 953; Butler v. United States (C.C.A.) 53 F.(2d) 800; Osborne v. United States (C.C.A.) 17 F. (2d) 246.

Second. We think there was no error in the refusal of the trial court to require the United States to elect as between the two counts in the indictment. The first count charged that appellant conspired with his father and with Stunz to commit the crime of grand larceny; the second charged a conspiracy between appellant, his father, and Stunz to cause Stunz to commit the crime of embezzlement. While it is true the charges are separate offenses, they are directly connected together, and it is obvious that the evidence offered to sustain one count was properly admissible and relevant to sustain the other. In this respect the joinder of the two in one indictment was in accordance with the provisions of section 1024, R.S. (18 U.S.C.A. § 557). In any case, however, such motions are addressed to the discretion of the court and are not reviewable on appeal. Pierce v. United States, 160 U.S. 355, 16 S. Ct. 321, 40 L.Ed. 454; Pointer v. United States, 151 U.S. 396, 14 S.Ct. 410, 38 L. Ed. 208; and see, also, Means v. United States, 62 App.D.C. 118, 65 F.(2d) 206.

Third. Enough has been said already to show, we think, that constantly throughout the period alleged in the indictment the McNeil account at the bank was overdrawn and that the overdrafts were made good from time to time by deposits caused to be made in the account by Stunz, whose position in the bank gave him complete control of its affairs as well as its funds. Sometimes the overdraft was more than made good and a balance remained, and at other times a new overdraft was created, each time by checks drawn by the elder McNeil or by appellant; sometimes by

both. In these circumstances the question and only question for the jury was whether the deposits were fictitious; and if they were, whether Stunz in what he did was acting in concert and agreement with appellant. Sauer, the accountant, during the period of his preliminary examination called the attention of appellant to these overdrafts and deposits, and as to one of them he testified that appellant admitted that both he and his father used the funds of the bank thus improperly placed to the credit of the account. In addition to this, appellant himself participated in many of the transactions in which, as we have shown, he personally made out the deposit slips. Then there is his explanation of the $14,000 transaction, which the jury may well have disbelieved. Altogether there was enough to take the case to the jury; and if they believed beyond a reasonable doubt there was a conspiracy between the three named persons to steal the bank's funds and a conspiracy on the part of the three named to have Stunz embezzle the funds of the bank, the verdict so returned should not be set aside in an appellate court.

Fourth. Exception is taken to the prayers Nos. 3 and 4 offered by the government and given by the court. The first of these instructions defines larceny; the second, embezzlement. Objection is made on the ground that the jury might have inferred that appellant, if he individually committed the offense of larceny or if he individually committed the offense of embezzlement, should be found guilty under the indictment; but we think this theory overdrawn and inapplicable. The instructions were mere abstract statements of the rule of the measure of proof in either the case of larceny or embezzlement. The other instructions clearly told the jury that the offenses charged were conspiracies and that, to convict, there must be proof of an agreement on the part of two or more of the alleged conspirators, plus an overt act. That was enough.

It is also assigned as error that the court refused to give at the instance of defendant prayers numbered 5, 9, and 10. Prayer 5 was objectionable in that it stated, as an essential element of conviction, that the jury must believe that all three of the alleged conspirators participated in the conspiracies; and it further required the government to prove each overt act alleged. In these respects it went too far.

And besides, the court's instruction No. 4, given at the instance of the defendant, covers the ground, and is all appellant had the right to ask. Nos. 9 and 10 were intended to emphasize the rule that the defendant was entitled to the presumption of innocence at every stage of the case. This subject was fully covered in the court's general charge, and anything further would have been confusing rather than helpful to the jury.

On the whole case we think that the question of appellant's guilt was properly submitted to the jury, and that the jury were in a better position than we are to determine the truth of the charge. Appellant took the stand in his own defense, and the jury had the opportunity of hearing his explanations of the transactions which formed the basis of the government's charge. His general defense was that he did what Stunz told him to do; that if Stunz directed him to make out a debit ticket to Robert Smith for $10,000, he would do it and ask no questions; and apparently this was actually true of other employees of the bank who were not charged with any complicity in the general looting for which Stunz unquestionably is primarily responsible. But in the instances in which the government charged wrongdoing against appellant, if there was wrongdoing, he and his father were beneficiaries, and this made the difference. That the manner of handling the account was extraordinary is not denied. That a considerable sum of money was lost to the bank as the result is unquestioned. Whether in these transactions appellant, his father, and Stunz intended to defraud the bank or whether, through the deposit by the elder McNeil of collateral with the bank, the transactions were regularized and the bank protected, was a question for the jury. In reaching a conclusion, the court told the jury that, if they could reconcile the evidence with any reasonable hypothesis consistent with the innocence of the defendant, they should find him not guilty. The jury heard his explanation and were not satisfied and accepted the well worked out theory of the government that there were conspiracies to rob the bank in which appellant participated and as a result of which he benefited financially. In these circumstances, our duty is to affirm the judgment of the court below.

Affirmed.