**WALKER et al. v. UNITED STATES.**

No. 4423.

Circuit Court of Appeals, Fourth Circuit.

June 12, 1939.

466

R. E. O'Connor, of Charleston, W. Va., and Connor Hall, of Huntington, W. Va. (Charles E. Mahan and R. T. Hubard, both of Fayetteville, W. Va., on the brief), for appellants.

John W. Hereford, Asst. U. S. Atty., of Huntington, W. Va. (Lemuel R. Via, U. S. Atty., of Huntington, W. Va., and Charles M. Love, Jr., Asst. U. S. Atty., of Charleston, W. Va., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

The appellants, Harry S. Walker, Peter McKay and Herbert Hatfield, together with Cecil Vandell and Ira Webb, were indicted for conspiring to commit divers offenses against the United States, and for doing certain acts in pursuance of the conspiracy, in violation of 18 U.S.C.A. § 88. It was charged that they conspired: (1) to violate 26 U.S.C.A. § 1184 by carrying on the business of a distiller without giving bond and with intent to defraud the United States of the tax on distilled spirits;

(2) to violate 26 U.S.C.A. § 1150 by carrying on the business of a retail liquor dealer without payment of the special tax as required by law; (3) to violate 26 U.S.C.A. § 1287 by removing and aiding and abetting in the removal of distilled spirits, on which the tax had not been paid, to a place other than a distillery warehouse or other bonded warehouse provided by law; (4) to violate 26 U.S.C.A. § 1441 by removing, depositing and concealing spiritous liquors with the intent to defraud the United States of the tax thereon; and (5) to violate 26 U.S.C.A. § 1440 by having in their possession and custody spiritous liquors for the purpose of selling the same without payment of the tax imposed thereon by law.

The overt acts charged to have been done pursuant to the conspiracy were as follows:

(1) That McKay, a constable of Fayette County, West Virginia, and Walker, a Justice of the Peace of said County, seized in their official capacity one quart of non-tax paid whiskey, from one Russell McCallister, and that Hatfield, representing himself to be an officer of the United States Government, assisted in the seizure of said whiskey, and that McKay, Walker and Hatfield did conceal and assist in concealing said whiskey;

(2) That McKay, Walker, Hatfield and Vandell unlawfully and feloniously transported, possessed, bought, sold and transferred one quart of distilled spirits without having affixed to the immediate container the stamp evidencing payment of taxes thereon;

(3) That Webb purchased from one George Davis fifteen cases of tax paid liquor and sold the same without paying the tax required of a dealer in spiritous liquors, and that McKay was present and assisted therein;

(4) That McKay and Vandell did unlawfully and feloniously sell and transfer to Edward Pugh one pint of spiritous liquor, without having affixed to the immediate container thereof the stamp denoting payment of taxes;

(5) That Walker seized four gallons of non-tax paid whiskey, and together with McKay, did sell the same without paying the tax thereon and without the containers thereof having stamps affixed as required by the revenue laws of the United States.

At the close of all the evidence, the court directed a verdict of acquittal on behalf of Webb, and the jury found the others guilty. Subsequently, the court granted a new trial and the District Attorney entered a nolle pros as to Vandell. Walker, McKay and Hatfield were each sentenced to a year and a day in prison. On their behalf a reversal of the judgment is sought on the grounds that rulings on the admissibility of evidence were erroneously made, that the evidence was insufficient to prove any of the crimes charged in the indictment, and that there were errors in the charge to the jury.

The Government asks that the conviction be affirmed on the ground that the evidence offered by it substantially proved the following facts during the pendency of the conspiracy from December 1, 1935 to September 1, 1938, as charged in the indictment. Walker was a justice of the peace and McKay a constable for Fayette County, West Virginia. The jurisdiction of the two men, however, lay within separate districts of the county, and McKay had no official powers in Walker's district except when executing therein an order of the justice of the peace for his own district. Five places were being operated in Walker's district for the illegal sale of liquor. Walker and McKay frequently went to these places for free liquor, most of which they consumed on the premises. Walker frequently drank to excess and was on one occasion convicted of drunkenness, and on another, of drunken driving. McKay and Walker did nothing to prevent the illegal sale of liquor at these five places, but continually arrested the customers. After convicting the customers of drunkenness, they would collect fines of $11.50 to $12.50 from each of them.

On January 25, 1936 McKay brought Hatfield, a coal miner who was not well known in this locality, to Walker's office. The three of them, together with Vandell, then went in Walker's car to a saloon called Big Bend. After arresting two or three people outside, Hatfield entered and said that he was a revenue agent from Baltimore sent to raid the place. Davis, the proprietor, recognized Hatfield, threw him out of the building and sent for the State Police to have him arrested for impersonation. Meanwhile, McKay and Vandell on the outside continued to arrest persons whom they charged with drunkenness.

Later the same evening, Walker, McKay and Hatfield visited a place run by one Morris at Winona. Here they again represented Hatfield to be a federal agent from Baltimore and searched the house under the pretense of possessing a search warrant. Upon finding two-thirds of a quart of non-tax paid whiskey in the coat pocket of one Pitzenberger, a guest, they arrested Morris and Pitzenberger, who were taken to Walker's office, immediately tried, and found guilty of "being drunk on a public highway", and fined $11.50 each.

Walker then drew a warrant directing McKay to search the "Edgewood Filling Station" operated by McCallister. Hatfield swore to the information of the warrant without any knowledge of the place. The three then went to the filling station, aroused McCallister and his wife, introduced Hatfield as a federal agent from Baltimore, and searched the building. A gallon and a half of moonshine and six or seven pints of bottled in bond liquor were discovered. McCallister and his liquor were taken to Walker's office where the former paid $40 and got a receipt therefor, but was docketed as having been fined $5 and costs of $6. After they all had imbibed some of McCallister's liquor in his presence, Hatfield returned the released prisoner to his home. No part of the seized liquor was turned over to the sheriff of Fayette County or to the West Virginia Liquor Control Commission, as is required by State law.

About a year later, Walker and McKay returned to McCallister's filling station, which they again searched. Seven pints of bonded whiskey were discovered, but upon McCallister paying them $5, they left the house without taking the whiskey and never troubled him again.

On August 9, 1937 Walker and Hall, another constable, found a keg containing four gallons of moonshine whiskey at the rear of the home of one Nelson. Mrs. Nelson and her sister were arrested and taken together with the whiskey to Walker's office. The following morning the keg had disappeared from Walker's office and was not seen again for several months until it was recognized being used as a cider container at Walker's home.

In February or March, 1937, Walker and Constable Hall searched the home of one Jones and confiscated sixteen pints of tax paid liquor. This liquor also was never turned over to the proper authorities.

Walker was seen to take several drinks of it and for three or four days was on a drinking spell.

Evidence of the following collateral facts was introduced concerning the conduct of McKay and the status of Webb and Vandell in the conspiracy. During the years 1932 to 1935, inclusive, McKay was almost constantly at the home of Vandell, who sold non-tax paid liquor there in the presence of McKay. Vandell used McKay's car to haul raw materials for moonshine into the mountains, and to bring the finished product from the mountains to his house. McKay was present during some of these operations, and was also present in Webb's store when Kentucky moonshine was delivered there. McKay, in his official capacity, seized a great deal of non-tax paid liquor, some of which he took to his home and drank.

█ We consider first whether there was sufficient evidence to take the case to the jury. In our opinion the evidence was insufficient to sustain the charge first mentioned, that the appellants conspired to carry on the business of a distiller with intent to defraud the United States of taxes in violation of 26 U.S.C.A. § 1184, and this charge has apparently been abandoned for lack of evidence, for it is not urged as a basis for sustaining the convictions.

█ With respect to the second charge, the Government contends that Walker's and McKay's wilful failure to prevent the illicit sale of non-tax paid liquor at various taverns and their receipt of tribute for not interfering with the successful operation of these places, amounted to a conspiracy to violate 26 U.S.C.A. § 1150 by aiding and abetting in the sale of such liquor, and by carrying on the business of a retail liquor dealer without the payment of the tax. It is said that the activities of the appellants amounted to participation in the sale of non-tax paid liquor; and that Hatfield was taken into the conspiracy so that he might raid the road houses as a federal agent, and justify the imposition of fines and costs without interfering with the other tribute which Walker and McKay received for not enforcing the law on their own initiative.

█ While this concerted action was lawless in the extreme, and would have justified criminal prosecution under both State and Federal laws, it did not amount to a conspiracy on the part of the appellants to carry on the business of a retail

liquor dealer. See Weniger v. United States, 9 Cir., 47 F.2d 692. But even if this were not so, the second charge is not sustained because 26 U.S.C.A. § 1150 does not relate to the business of a retail dealer. It levies on all distilled spirits produced in or imported into the United States a tax that must be paid by the distiller or importer before the spirits may be withdrawn from bond; but it imposes no penalty upon one who carries on the business of retail liquor dealer without payment of a special tax. That subject matter is covered by 26 U.S.C.A. §§ 1394 and 1397. It may be that the prosecutor intended to charge a conspiracy to violate the last mentioned sections; but the sufficiency of the evidence must of course be judged with respect to the offenses actually alleged in the indictment.

■ There remain the third, fourth and fifth charges of conspiracy to violate 26 U.S.C.A. §§ 1287, 1441, 1440, respectively. Section 1287 makes it a crime to remove or aid or abet in the removal of any distilled spirits on which the tax has not been paid to a place other than a warehouse provided by law, or to conceal or aid in the concealment of any such spirits so removed. Section 1441 makes it a crime to remove, deposit or conceal, or to be concerned in the removal, deposit or concealment of any goods or commodities for or in respect whereof any tax is imposed with the intent to defraud the United States of such tax. Section 1440 subjects to a heavy penalty any person who has in his custody or possession any goods on which taxes are imposed by law for the purpose of selling the same in fraud of the internal revenue laws. There was evidence tending to show that the appellants seized non-tax paid liquor, as described in the first, second and fifth overt acts, and that they made use of the liquors for their personal benefit. The jury would have been justified in finding upon this evidence that the conduct of the appellants amounted to a removal or concealment of illicit liquor, with intent to defraud the United States of the tax, and it follows that there was sufficient evidence to submit to the jury. See Simpkins v. United States, 4 Cir., 78 F.2d 594.

■ With respect to the instructions of the court, the objection is made that the jury were instructed that they might find the defendants guilty of a crime not covered by the indictment. The District Judge told the jury in the charge that "the first case I want to take up with you is that of this man Hatfield, who is charged with representing himself to be an officer of the United States"; and also that if the jury should believe from the evidence that the defendants violated the statute making it a crime for a person to impersonate a federal officer, they would be justified in finding a verdict of guilty. It is undoubtedly true that if the defendants, with intent to defraud, combined and agreed together to palm off Hatfield as a revenue officer of the United States, they could have been indicted for conspiracy to violate 18 U.S.C.A. § 77, and could have been convicted of the crime therein denounced. But no such charge was made in the indictment in this case; and the impersonation of an officer by Hatfield was set out only as one of the acts done in pursuance of the conspiracy to violate certain specified revenue laws. It was therefore error to instruct the jury to convict the defendants of the conspiracy charged, if they should find that an unlawful impersonation of a federal officer had taken place; and although no objection was made to the charge at the time of its delivery, the mistake was so prejudicial in character as to require the reversal of the judgment on this appeal. See Lamento v. United States, 8 Cir., 4 F.2d 901; Peter v. United States, 8 Cir., 23 F.2d 659.

■ Many objections urged by the appellants to rulings on the admissibility of testimony must be noticed, since the case must be sent back to the District Court for further action. In general, the rule is well established that much latitude in the scope of the evidence should be permitted in a trial for conspiracy, and much dependence should be placed upon the wide discretion of the trial judge, on the one hand, to admit such testimony as tends to prove the existence of an unlawful combination, and on the other, to exclude prejudicial testimony so remote from the point of inquiry as to result in practical injustice to the defendants. See McNeil v. United States, 66 App.D.C. 199, 85 F.2d 698; Smith v. United States, 8 Cir., 267 F. 665; Shaw v. United States, 5 Cir., 41 F.2d 26; Fain v. United States, 8 Cir., 209 F. 525. The rule has been applied not infrequently in cases involving the delinquencies of state officials in connection with illicit liquor traffic. Gibson v. United States, 9 Cir., 31 F.2d 19, certiorari denied 279 U.S. 866, 49 S.Ct. 481, 73 L.Ed. 1004; Metzler v. United

470

States, 9 Cir., 64 F.2d 203; Weniger v. United States, 9 Cir., 47 F.2d 692.

The government offered considerable evidence with regard to the use of intoxicating liquors by the defendant Walker. Such evidence was admissible insofar as it tended to show that Walker or the other conspirators were obtaining and using illicit liquor from liquor dealers who were violating the law with the knowledge of the state officers named in the indictment; but other evidence was admitted of isolated instances of the use of intoxicating liquors by the defendant Walker that had no apparent connection with the general scheme, such as, evidence that the appellant Walker had been convicted for being drunk. This evidence should have been excluded.

Other evidence admitted, relating to disconnected incidents, was prejudicial to the defendant Walker, such as acts of violence and maltreatment committed by Walker in the arrest and confinement of persons charged with violations of the law. This evidence was not relevant to the conspiracy charged and should have been excluded.

There was also a great deal of other evidence admitted tending to show that in 1933-5, before the period covered by the conspiracy charged in the indictment, the appellant McKay assisted in the operation of a still and also raided several stills in the mountains and appropriated the captured liquor to his own use. This evidence was of course prejudicial; and as there was nothing to indicate that McKay's prior actions had any relation to the conspiracy charged in the indictment, the evidence should have been excluded as too remote to the point of inquiry. For cases bearing upon the admissibility of testimony tending to show the commission by a defendant of offenses other than those charged in the indictment, see Crowley v. United States, 9 Cir., 8 F.2d 118; Simpkins v. United States, 4 Cir., 78 F.2d 594, 598; Breedin v. United States, 4 Cir., 73 F.2d 778, 780; Tincher v. United States, 4 Cir., 11 F.2d 18, 20; Williamson v. United States, 207 U.S. 425, 451, 28 S.Ct. 163, 52 L.Ed. 278; Bottomley v. United States, 3 Fed.Cas. p. 968, No. 1,688; Jones v. United States, 9 Cir., 179 F. 584, 610. Compare Taylor v. United States, 5 Cir., 80 F.2d 604, certiorari denied 297 U.S. 708, 56 S.Ct. 503, 80 L.Ed. 995; York v. United States, 9 Cir., 241 F. 656; Wallace v. United States, 7 Cir., 243 F. 300.

The appellants also object that the government was allowed to impeach certain of its witnesses by cross-examining them with respect to certain written statements contrary to their testimony which they had made before trial. The rule to be applied in dealing with a recalcitrant witness is thus stated in DiCarlo v. United States, 2 Cir., 6 F.2d 364, 368: "The latitude to be allowed in the examination of a witness, who has been called and proves recalcitrant, is wholly within the discretion of the trial judge. Nothing is more unfair than to confine a party under such circumstances to neutral questions. Not only may the questions extend to cross-examination, but, if necessary to bring out the truth, it is entirely proper to inquire of such a witness whether he has not made contradictory statements at other times. He is present before the jury, and they may gather the truth from his whole conduct and bearing, even if it be in respect of contradictory answers he may have made at other times." See, also, Big Vein Pocahontas Co. v. Repass, 4 Cir., 238 F. 332; Curtis v. United States, 10 Cir., 67 F.2d 943, 946; London Guaranty & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325.

The defendant Walker went on the stand as a witness in his own behalf, and was cross examined with reference to certain prior convictions for crime, and it is objected that this evidence was inadmissible; but it is settled that when a defendant tenders himself as a witness, his credibility, like that of any other witness, may be questioned by asking him as to previous convictions. Nutter v. United States, 4 Cir., 289 F. 484; Merrill v. United States, 9 Cir., 6 F.2d 120; cases collected 103 A.L.R. 362. There was no error in this ruling.

The court excluded the testimony of the witness Cavendish to the effect that the neighborhood was overrun with lawlessness before Walker was appointed justice of the peace, and that Walker had decreased law violations in his district and was consequently unpopular with his neighbors whom he prosecuted. There was no error in this ruling. The testimony was little more than the expression of opinion of the witness, and even if well founded in fact, did not tend to refute the positive testimony of witnesses for the government. Shaw v. United States, 5 Cir., 41 F.2d 26.

For the reasons above stated, the judgment of the District Court must be reversed.