### SIMON v. UNITED STATES.
### No. 4828.

Circuit Court of Appeals, Fourth Circuit.
Oct. 10, 1941.

Writ of Certiorari Denied Dec. 22, 1941.

See —— U.S. ——, 62 S.Ct. 412, 86 L.Ed. ——

Randolph Bias, of Williamson, W. Va. (Bias & Bias, of Williamson, W. Va., and Oscar Tabory, of Logan, W. Va., on the brief), for appellant.

Charles M. Love, Jr., Asst. U. S. Atty. of Charleston, W. Va., and Raoul Berger, Sp. Asst. to Atty. Gen. (Lemuel R. Via, U. S. Atty., of Huntington, W. Va., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This case involves an appeal from a conviction and sentence by the District Court of the United States for the Southern District of West Virginia. The appellant, Doctor S. M. E. Simon (hereinafter called the appellant), was indicted at the October, 1940, term of court, for concealment of assets and false swearing, in connection with a bankruptcy proceeding, in violation of U.S.C.A. Title 11, Section 52, Subsection b(1) and (2). The Statute in question reads as follows: "A person shall be punished by imprisonment * * * upon conviction of the offense of having knowingly and fraudulently (1) concealed from the * * * trustee * * * in any proceeding under this title, any property belonging to the estate of a bankrupt; or (2) made a false oath or account in or in relation to any proceeding under this title * * *."

The indictment was framed in seven counts. Counts 1, 2, and 4 charge that the defendant concealed from his trustee in bankruptcy various accounts receivable, two of which had been reduced to judgment, amounting in all to approximately $377; Count 3 charges concealment of a judgment and certain collections made thereunder, after bankruptcy; Count 5 charges concealment of three parcels of realty referred to as (1) Pikeville property; (2) Dahman property, upon which an apartment house was erected prior to the bankruptcy, and (3) Mercy Hospital. The realty was valued at approximately $65,000. Counts 6 and 7 charge false swearing with respect to the property covered by Counts 1 and 2.

After an extended trial, the jury returned a verdict of guilty on all seven counts. The appellant had moved for a directed verdict of not guilty on each of the seven counts and this motion had been overruled. The court sentenced the defendant to three years in a federal penitentiary on each count, these sentences to run concurrently, and imposed a fine of $1,000 each on Counts 1, 2, and 5.

The defendant makes three contentions which form the basis for this appeal: (1) that owing to the hostile conduct of the trial judge, he did not receive a fair and impartial trial as guaranteed by the Sixth Amendment; (2) there was no substantial evidence to support the conviction; (3) that incompetent evidence involving the commission of other crimes was erroneously admitted. We shall now discuss these contentions in their respective order.

Appellant's first contention is that he "has not had the fair and impartial trial guaranteed him by the Sixth Amendment" to the Federal Constitution. This contention is based on the conduct of Judge Harry E. Watkins, who presided over the trial of appellant.

It would serve no useful purpose, and would unduly prolong this opinion, were we to set out at length, and to discuss in detail, the unwarranted nature of these allegations. But since these contentions are seriously made, and since the liberty of a human being is at stake, these contentions have all been carefully examined in the light of the record. We are, after such an examination, firmly convinced that they have no real basis in either law or fact and that appellant had a fair trial, with every safeguard to which he was entitled. The trial was long and trying on all those concerned. The evidence

was complicated, there were numerous witnesses and a mass of documents figured conspicuously; while almost every point, on which any contest was possible, was bitterly fought by zealous counsel for appellant. Under these circumstances, we think Judge Watkins displayed a commendable patience. And, in the conduct of Judge Watkins, we find no ground for a reversal of the judgment in the instant case. We advert briefly to some instances which are stressed by counsel for appellant.

When counsel for appellant informed the court that the government consumed too much time in placing certified copies of certain deeds in the record, Judge Watkins replied: "I think it has been done in a proper manner." This, we are told, is a reprimand of appellant's counsel, with an intimation that it might have been done for the purpose of influencing the jury. (Appellant's brief, p. 14.)

 On the fifth day of the trial, at appellant's request for a recess of thirty minutes for a conference with witnesses, the judge granted a recess of fourteen minutes (Appellant's brief, p. 14). During the sixth day of the trial, the judge said: "Gentlemen, as indicated before, I want you all not to overlook anything, but at the same time let us endeavor to hurry along as much as possible. I indicated yesterday we were going to try to finish today. If we don't, we just can't, but we are going to do the best we can."

We certainly cannot read into this conduct of Judge Watkins any attempt on his part to prejudice the jury against the appellant. When Judge Watkins required certain documents to be read to the jury, instead of having these documents turned over to the jury, we think he acted quite properly. Yet appellant would have us believe by his comment: "The purpose is plain." (Appellant's brief, p. 16) that this was a deliberate attempt on the part of the trial judge to prejudice appellant improperly in the eyes of the jury.

 Appellant's counsel vigorously insists that the judge, in many suggested instances, treated the government witnesses with the utmost courtesy and consideration, but by harsh and forbidding demeanor sought to discredit appellant's witnesses and reflect seriously upon their credibility. We find no reasonable basis for this contention. Counsel for appellant was altogether too ready to attribute unworthy motives to the trial judge merely because the rulings of the judge were adverse to the contentions of appellant's counsel.

 Appellant's counsel strenuously complains that the trial judge questioned the witnesses from time to time in an effort to bring out the facts of the case. This is precisely what he should have done. It cannot be too often repeated, or too strongly emphasized, that the function of a federal trial judge is not that of an umpire or of a moderator at a town meeting. He sits to see that justice is done in the cases heard before him; and it is his duty to see that a case on trial is presented in such way as to be understood by the jury, as well as by himself. He should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other. In no case is the exercise of this power of the judge more important than in one like this, involving, as it does, lengthy circumstantial testimony, the force of which may be lost upon the jury if it is not properly presented or if its salient features are not called to the jury's attention at the time. The judge is the only disinterested lawyer connected with the proceeding. He has no interest except to see that justice is done, and he has no more important duty than to see that the facts are properly developed and that their bearing upon the question at issue are clearly understood by the jury.

The second ground of appeal goes to the heart of the case since it involves the contention that the evidence was insufficient to go to the jury. Dr. S. M. E. Simon, the appellant, was a physician who operated the Mercy Hospital at Williamson, West Virginia. Born in Austria in 1900 and educated in Germany where he received a medical degree, he came to America in 1928. After some professional experience in this country, he married a Roumanian woman who was also a graduate physician and had come to this country after the death of her first husband, a Roumanian banker, in 1929. After the marriage, the appellant was employed in hospitals in New Jersey and in West Virginia. Later he operated a hospital in Logan, West Virginia, which was subsequently sold, and finally he opened the Mercy Hospital at Williamson, West Virginia, in the early part of 1936.

On November 2, 1938, the appellant filed a voluntary petition in bankruptcy in the Southern District of West Virginia, ac-

companied by schedules, showing liabilities of $46,181.50 and assets of $684.62. Among the liabilities were certain claims against the appellant for medical malpractice and certain debts due his wife and his brother-in-law. The assets included accounts receivable of $584.62 and one share of stock in a hospital of $100. It is admitted that the bankruptcy proceeding was instituted by the appellant because he had been mistakenly advised that he could thereby escape the payment of certain tort claims against him.

■ The real estate covered by Count 5 greatly exceeds in value all the other property mentioned in the other counts of the indictment. In order to prove that moneys of the appellant had been invested in the real estate as charged, the government painstakingly presented a large mass of evidence consisting of checks, deposit slips, bank ledger pages, etc., and prepared two charts tracing the earnings of the appellant into the properties and the improvements thereon. The accuracy of these charts is not denied by the appellant. Other documents were produced by the government to show that although the title to the several properties stood in his wife's name, the appellant had a substantial and valuable interest therein. On June 14, 1937, and August 3, 1937, respectively, he gave two statements to Dun and Bradstreet Agency in order to establish a credit rating for the hospital. He described himself in these statements as Dr. Simon. trading as Mercy Hospital, and claimed assets of $105,000 and liabilities of $4,200, listing certain real estate of the aggregate value of $78,000 amongst the assets. The only answer to these statements on the part of the appellant is that they represented an inexcusable attempt on his part to obtain a credit rating, by falsely representing that certain properties of his wife belonged to him. In further corroboration of the charts prepared by the government are the statements in a letter of April 9, 1933 written by the appellant to the American Consul at Bucharest, supporting an application for a visa for the mother of Mrs. Simon, in which letter the appellant stated that he was the owner of a 75-bed hospital, and that he owned real estate worth $75,000. The writing of this letter is admitted by the appellant, and again the only excuse offered was that the letter contained false statements regarding property that belonged to his wife. This and similar evidence tends to show that appellant, chameleon-like,

would change his color whenever it suited his purpose. Other circumstances were also corroborative of the appellant's ownership of the property, including the payment of taxes and the collection of rents. The contents of income tax reports of the appellant for the years 1936 and 1937, hereinafter referred to, also tend to show that the business conducted at the hospital belonged to the appellant. But sufficient has been said to show that there is no merit in appellant's contention that the evidence in the case was insufficient to go to the jury. Rather we think that there was ample evidence to support the government's contention that a secret trust existed in favor of the appellant, creating in him an equitable interest which he should have listed in his schedules. There was also substantial testimony tending to show that each of the credits which appellant had failed to include in his schedule of assets in the bankruptcy proceedings, as charged in the indictment, belonged to him.

In order to offset the testimony of the government outlined above, the appellant produced certain witnesses who gave evidence which tended to show that all of the credits and properties mentioned in Counts 1, 2, 3 and 4 of the indictment belonged to Mrs. Simon and not to him. The appellant, and other members of the family of Mrs. Simon, testified that the money which had been invested in the properties and in the hospital business had come from Roumania and had been derived from the estate of the first husband of Mrs. Simon or from her father or other members of the family, who were persons of substantial financial means in Roumania. The explanation was offered that the moneys shown on the government charts above mentioned had been advanced or loaned by Mrs. Simon to her husband out of the moneys which she had received from abroad. No records were produced to show how the moneys were transferred from Roumania to the United States or where they were deposited when received in this country. The appellant's evidence indicated that the moneys received from Roumania were retained in the personal custody of Mrs. Simon, or other members of her family, and advanced by her to her husband from time to time as needed. It is quite obvious that it was the province of the jury to weigh the evidence offered by the government, and to decide whether or not the charges contained in the indictment had been sustained. There is no merit in the contention of the appel-

lant that the evidence was insufficient to go to the jury. It is equally clear, we think, that the government offered evidence which amply sustained the charges of false swearing contained in Counts 6 and 7 of the indictment.

 Complaint is made under the third contention that during the cross-examination of the defendant, the court permitted him to be questioned with respect to statements made in an application for an immigration visa in the year 1927 and with respect to statements made in the federal income tax return filed by defendant for the year 1936 and the return filed by him for himself and wife for the year 1937. It is said, that, since these statements were made under oath, the examination was directed to showing that the defendant was guilty of crimes other than that for which he was on trial. It is a sufficient answer to this that no such objection was interposed at the time. Matheson v. United States, 227 U.S. 540, 545, 33 S.Ct. 355, 57 L.Ed. 631; United States v. Carey, 110 U. S. 51, 3 S.Ct. 424, 28 L.Ed. 67; Breedin v. United States, 4 Cir., 73 F.2d 778, 780. As was said in the last case cited: "We exercise the power to notice plain error not assigned only where necessary to prevent a miscarriage of justice; and a careful examination of the record convinces us that there is no occasion to exercise it here."

 In addition to this, we think the cross-examination with respect to these matters was entirely proper. The tax returns tended to show the ownership by defendant of an interest in the hospital property in controversy; and the making of false statements under oath with respect to the date of birth in the application for the visa and with respect to an item of income of $4,000 in the 1937 tax return were proper subjects of inquiry, with the view of testing the credibility of the defendant who was testifying in his own behalf. Rees v. United States, 4 Cir., 95 F.2d 784, 793. In Pullman Co. v. Hall, 4 Cir., 55 F. 2d 139, 141, we laid down the rule applicable in such cases as follows: "The rule is that for the purpose of impeaching the credibility of a witness he may be questioned as to misconduct, even as to collateral matters, which has a tendency to show his lack of honesty or truthfulness; the qualification of the rule being that the party questioning him is bound by his answers and may not contradict him with regard thereto. See Wigmore on Evidence (2d Ed.) vol. 2, § 982 et seq.; Greenleaf on Evidence, Lewis' edition, § 459; 28 R.C.L. 607; Tla-koo-yel-lee v. United States, 167 U.S. 274, 277, 17 S.Ct. 855, 42 L.Ed. 166. It is said that it was within the discretion of the trial judge whether questions would be permitted as to acts of misconduct affecting credibility. We think, however, that the matter resting within the discretion of the judge is merely the extent to which such examination may be pursued."

 It is argued that because the defendant was on trial he was not subject to impeachment by cross-examination as to other offenses like an ordinary witness. It is well settled, however, that where a defendant elects to make himself a witness he may be cross-examined as such. Walker v. United States, 4 Cir., 104 F.2d 465; Tierney v. United States, 4 Cir., 280 F. 322, 324; Christopoulo v. United States, 4 Cir., 230 F. 788, 791; Fields v. United States, 4 Cir., 221 F. 242; Nutter v. United States, 4 Cir., 289 F. 484, 485; Murray v. United States, 7 Cir., 10 F.2d 409, 412; United States v. Buckner, 2 Cir., 108 F. 2d 921; United States v. Frankel, 2 Cir., 65 F.2d 285; United States v. Sager, 2 Cir., 49 F.2d 725; Merrill v. United States, 9 Cir., 6 F.2d 120; Coulston v. United States, 10 Cir., 51 F.2d 178, 181. In the case last cited the rule is well stated by the late Judge McDermott as follows: "If the defendant takes the witness stand, a different rule comes into play. He steps out of his character as a defendant, for the moment, and takes on the role of a witness, and as such becomes subject to cross-examination in the same manner and to the same extent as any other witness. * * * In criminal cases, there may therefore be differences arising from variations in the common law in the different jurisdictions at the time of their admission into the Union. It may however be said that, subject to possible variants so arising, it is well settled in criminal cases in the federal courts that cross-examination must be confined to the subjects of the direct examination [citing cases]; that the credibility of a defendant who has testified may be impeached in the same manner and to the same extent as any other witness, and no further [citing cases]; questions asked on cross-examination for the purposes of impeachment should be confined to acts or conduct which reflect upon his integrity or truthfulness, or so 'pertain to his personal turpitude, such as to indicate such moral

depravity or degeneracy on his part as would likely render him insensible to the obligations of an oath to speak the truth' [citing case]; when such a question is asked and answered, the inquiry is ended; the government is bound by the answer in that it may not, on rebuttal, offer counter-vailing proof [citing cases]. To this latter rule, there is one exception: In criminal cases a witness may be asked, for purposes of impeachment, whether he has been convicted of a felony, infamous crime, petit larceny, or a crime involving moral turpitude, and on rebuttal the record of such conviction is admissible. [Citing cases.] A witness may not be asked if he has been accused or arrested for a crime, for the sufficient reason that it calls for hearsay evidence, and because accusation carries no implication of guilt. Glover v. United States, 8 Cir., 147 F. 426, 430, 8 Ann.Cas. 1184; Pittman v. United States, 8 Cir., 42 F.2d 793; State v. Greenburg, 59 Kan. 404, 53 P. 61."

In this connection, too, it may be noted that Judge Watkins carefully cautioned the jury: "Gentlemen, I feel that I should caution you that this defendant is being tried only for the charges contained in this indictment. He is not expected to stand trial here for any other crimes, and if he has committed other crimes, that alone is not sufficient to convict him of the charges in this indictment. Different matters have been introduced in the record here for the purpose of showing the conduct of the defendant, and for the purpose of giving the jury a picture as to his conduct, and his statements, in order that the jury may determine what weight to give his testimony." (Appellant's Appendix, pp. 162, 163.)

We accordingly affirm the judgment of the District Court.

Affirmed.