UNITED STATES of America,
Appellee,

v.

Edwin Wallace PENNIX, Appellant.

No. 8724.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 7, 1962.

Decided Jan. 15, 1963.

Emmet J. Bondurant (Court-assigned counsel) [Smith, Kilpatrick, Cody, Rogers & McClatchey, Atlanta, Ga., on the brief] for appellant.

Roy G. Hall, Jr., Asst. U. S. Atty. (William H. Murdock, U. S. Atty., on the brief) for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

At approximately 11:30 o'clock on the morning of March 8, 1962, The American Federal Savings & Loan Association, 1913 East Market Street, Greensboro, North Carolina, insured by The Federal Savings & Loan Insurance Corporation under certificate No. 4255, was robbed of $930.15 in cash at gun point. The manager was shot in the hand during the course of the robbery.

Edwin Wallace Pennix, appellant here (who will be referred to as Pennix or defendant), Alfred Neal and Floyd Douglas Patterson, after waiver of formal indictment, were charged in a two-count information with robbery of a federally insured savings and loan association. Neal and Patterson entered pleas of guilty and testified for the Government at the jury trial of Pennix on his plea of not guilty.

At the conclusion of all the evidence, the District Court dismissed Count Two of the information which charged a violation of 18 U.S.C. 2113(d) (putting the lives of certain persons in jeopardy by the use of a dangerous weapon during the robbery) and submitted for jury determination the guilt or innocence of Pennix on Count One, which charged a violation of 18 U.S.C. 2113(a) (robbery of the named federally insured institution by force and violence). Pennix was found guilty and was sentenced to a term in prison. We think the judgment of conviction should be set aside and Pennix awarded a new trial.

The testimony of the confessed armed robber, Alfred Neal, is substantially as follows. On the morning of the robbery, he went to the house where Pennix resided with his mother to borrow money from Pennix with which to pay an overdue electric light bill in the amount of $6.51. Neal took with him a revolver intending to pledge it as security for the repayment of the prospective loan. Pennix proposed to Neal that he, Neal, rob The American Federal Savings & Loan Association so that both would have money. It was suggested by Pennix that Neal obtain the assistance of another man to insure success. Pennix drove Neal to Patterson's house, had Neal bring Patterson out to the automobile and proposed to Patterson that he assist Neal in the robbery. Pennix instructed Neal and Patterson to purchase a loaf of bread and thus acquire a paper bag in which to carry the robbery loot. After making the purchase, they parked in the vicinity of the Savings & Loan Association office and Neal and Patterson left the car.

However, they lost their nerve and returned to the vehicle in which the three then drove away. Pennix became angry and insisted that they should go through with the plan. They returned, Pennix again let Neal and Patterson out of the car a short distance from the Savings & Loan Association and drove around to the highway cloverleaf at the rear of the Association office. Neal and Patterson perpetrated the robbery, Neal handling the gun and obtaining the money and Patterson apparently acting as a lookout. When the gun was discharged both men hurriedly left the scene, Patterson returned to the defendant's car and he and Pennix made a hasty getaway before Neal could join them. Neal crawled under a nearby house and counted the money which he had taken. Patterson was later taken into police custody. Neal, realizing he was about to be apprehended, surrendered both himself and the money. Neal and Patterson, when questioned, implicated Pennix who was then arrested.

Neal's recital of events following the time when Neal and Pennix first contacted Patterson on the morning of the robbery was corroborated by Patterson.

At the trial, Pennix, who was represented by privately retained counsel, took the witness stand in his own behalf and denied all complicity in the robbery. He testified that while he was in bed, Neal came to his home early on the morning of March 8, roused him from sleep and requested a loan of $6.51 with which to pay an overdue light bill. These two had been acquainted for a month or more and Neal had called at the Pennix home on occasions in company with another acquaintance of Pennix. After lending Neal the money, Pennix drove him to downtown Greensboro to permit him to pay the light bill. Pennix was driving his two-tone 1958 Oldsmobile convertible which he had purchased on a deferred payment plan. He was partially paralyzed but could drive very well. During the drive, Neal stated that he was in desperate need of money and suggested that he and Pennix rob The American Federal Savings & Loan Association. Pennix refused and Neal requested that they pick up his friend, Patterson, which they did. After driving around for a period of time, during which Neal and Patterson discussed the robbery, Pennix let them out of the car at their request. He then proceeded past the Association office and onto the cloverleaf to the rear. As he was driving down the cloverleaf and applied the brakes, his motor stalled as it often did. After some difficulty, he was able to get the motor started and to drive away. He denied that Patterson rejoined him or that he had driven away at a speed greater than normal.

Witness Ellison, who was working in the vicinity, testified that he observed a car of the same general description as the Pennix car and occupied by one person, parked on the cloverleaf but he could identify neither the car nor the driver. He did say, however, that shortly before he heard of the robbery another unidentified person entered the car and the two drove away at a fast rate of speed. Witness Johnson, who was driving a small truck and who was personally acquainted with Pennix, testified that he saw the defendant sitting in his car on the cloverleaf near the rear of the Association office and that he waived to Pennix as he drove by. According to the defendant's own admission, he was in his own car on the cloverleaf at about the time of the robbery but he offered an explanation of his presence there. The primary points of conflict between his testimony and that of Ellison are the defendant's denials that another person entered *his* car and that the car was then driven away at unusually high speed.

The United States Attorney vigorously cross-examined Pennix, concluding that examination with the following questions and answers:

"Q. Have you ever been caught and convicted of any offense since being here [Greensboro]?

"A. I have been tried.

"Q. How many times?

"A. I don't know, it has been quite a few.

"Q. You mean by that it is so many that you don't know?

"A. I have been arrested quite a few times.

"Q. How many times have you been arrested?

"A. I don't know. I admit my record.

"Q. You admit your record?

"A. That's right.

"Q. Well, let me see, how about 30 times, would that sound about right?

"A. I don't know. You have got it down there.

"Q. Well, do you think it is any more than that?

"A. I don't know."

The government attorney commented, "That's all," and the court directed Pennix to "Come down." Defendant's counsel interposed no objection to this line of questioning.

After charging the jury at length as to the manner of determining the credibility of *all* witnesses, and after referring particularly to the defendant who testified in his own behalf, the District Court added:

"*Where a witness admits he has a criminal record, you should take that into consideration* and his demeanor upon the witness stand *for the purpose of determining whether or not he is telling the truth* in order that you can decide what weight you will attach to his testimony." (Emphasis supplied.)

There was no objection to this charge.

On this appeal Pennix contends that the District Court erred in permitting his

cross-examination as to prior arrests, the error was so plain and so affected his right to a fair trial by an impartial jury that it should be noticed by this court, even in the absence of objection, and he should be awarded a new trial.

■ Generally a specific objection is required before a ruling of the trial court may be attacked as error.[1] But this rule is neither absolute nor inflexible. The appellate courts are expressly authorized to notice plain errors or defects affecting substantial rights even though they were not brought to the attention of the court by timely objection.[2] In Breedin v. United States, 73 F.2d 778, 780 (4th Cir., 1934), this court said: " * * * We exercise the power to notice plain error not assigned only where necessary to prevent a miscarriage of justice; * * *." The obligation of a reviewing court was discussed by the Supreme Court of the United States in Kotteakos v. United States, 328 U.S. 750, 763–765, 66 S.Ct. 1239, 1247–1248, 90 L. Ed. 1557 (1946):

"Some aids to right judgment may be stated more safely in negative than in affirmative form. Thus, it is not the appellate court's function to determine guilt or innocence. [Citations omitted.] Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. Appellate judges cannot escape such impressions. But they may not make them sole criteria for reversal or affirmance. Those judgments are exclusively for the jury, given always the necessary minimum evidence legally sufficient to sustain the conviction unaffected by the error. [Citations omitted.]

\* \* \* \* \* \*

1. Rule 51, Federal Rules of Criminal Procedure. The pertinent portion of this rule is as follows: "Exceptions to rulings or orders of the court are unnecessary and for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is

made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor; \* \* \*."

2. Rule 52(b), Federal Rules of Criminal Procedure.

" * * * And the question is, not were they [the jurors] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting. [Citations omitted.]

* * * * * *

"If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. [Citations omitted.] But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

To the same effect, see Krulewitch v. United States, 336 U.S. 440, 444, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

In Echert v. United States, 188 F.2d 336 (8th Cir., 1951), the issue of the substantiality of the precise error asserted in the case at bar was squarely raised and decided. It was the contention of the Government that its cross-examination of the defendant in a Mann Act prosecution with regard to his prior arrests was no more than harmless error under Rule 52(a), Fed.R.Crim.P., which directs that any error, defect, irregularity or variance which does not affect substan-

tial rights shall be disregarded. Recognizing the heavy burden imposed upon a reviewing court by the decision of the Supreme Court in Kotteakos v. United States, supra, to grant a reversal only for those errors which are not insubstantial, the Court of Appeals for the Eighth Circuit (188 F.2d at 342), quoting from Sang Soon Sur v. United States, 167 F.2d 431, 432 (9th Cir., 1948), said:

" ' * * * it is inconsistent with our traditional conception of a fair trial to permit any information to go to a jury which might influence a jury to convict a defendant for any reason other than that he is guilty of the specific offense with which he is charged.' [Citations omitted.]

"Applying these tests to the record before us, we think the errors complained of did prejudicially affect the substantial right of the appellant * * * to a fair trial."

■■ We do not question the well-settled rule that a defendant who voluntarily offers himself as a witness and testifies in his own behalf subjects himself to legitimate and pertinent cross-examination to test his veracity and credibility. Cross-examination of an accused as to collateral matters should properly be limited to an effort to discredit him as a witness, and the limit is exceeded when the questions are not useful for that purpose and the necessary result, and perhaps the purpose, is merely to prejudice the jury against the defendant.[3]

This court, speaking through the late Judge Dobie and quoting from Coulston v. United States, 51 F.2d 178, 182 (10th Cir., 1931), in Simon v. United States, 123 F.2d 80, 86 (4th Cir., 1941), cert. denied, 314 U.S. 694, 62 S.Ct. 412, 86 L. Ed. 555, held:

" ' * * * A witness may not be asked if he has been accused or arrested for a crime, for the sufficient reason that it calls for hearsay evidence, and because accusation carries no implication of guilt. [Citations omitted.]' "

---

3. See 58 Am.Jur., Witnesses, § 687, page 373.

In Manley v. United States, 238 F.2d 221, 222 (6th Cir., 1956), the court said:

"It is well settled that it is not permissible for the government to show that a defendant has been accused of, arrested for, or indicted for a crime. Only a previous *conviction* for crime is admissible, under appropriate circumstances."

In Michelson v. United States, 335 U.S. 469, 482 (1948), 69 S.Ct. 213, 221–222, 93 L.Ed. 168, where the defendant had offered "character witnesses" to testify as to his good reputation, the Court said:

"A *character* witness may be cross-examined as to an arrest *whether or not it culminated in a conviction,* according to the overwhelming weight of authority. *This rule is sometimes confused with that which prohibits cross-examination to credibility by asking a witness whether he himself has been arrested.* (Emphasis supplied.)

"Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty. * * *"

The Court of Appeals for the Sixth Circuit in Banning v. United States, 130 F.2d 330, 338 (1942), cert. denied, 317 U.S. 695, 63 S.Ct. 434, 87 L.Ed. 556, had this to say:

"Attempts are often made to convict persons of crime by showing they have been arrested on previous occasions or that they have been confined in jail, or have committed other offenses having no connection with or relation to the crime for which they are on trial. Such evidence, standing alone, is highly prejudicial and its admission universally condemned. We have no intention of modifying this rule of exclusion, * * *."

■■ As we have indicated, witnesses, including an accused if he voluntarily submits himself as a witness, may, for purposes of impeachment, be questioned as to prior convictions. See Walker v. United States, 104 F.2d 465, 470 (4th Cir. 1939), where this court, speaking through Judge Soper, said:

"The defendant Walker went on the stand as a witness in his own behalf, and was cross examined with reference to certain prior convictions for crime, * * *; but it is settled that when a defendant tenders himself as a witness, *his credibility,* like that of any other witness, *may be questioned by asking him as to previous convictions.* Nutter v. United States, 4 Cir., 289 F. 484; Merrill v. United States, 9 Cir., 6 F.2d 120; cases collected 103 A.L.R. 362." (Emphasis supplied.)

But it is clearly established that the cross-examiner may not go further and inquire of a defendant concerning only his prior arrest or indictment for crime. This rule is based upon a clear recognition of the fact that the probative value of such evidence is so overwhelmingly outweighed by its inevitable tendency to inflame and prejudice the jury against the defendant that total and complete exclusion is required in order that the right to trial by a fair and impartial jury may not be impaired. In Coyne v. United States, 246 F. 120, 121 (5th Cir., 1917), the court made the following observations concerning the introduction of evidence of prior indictment:

"* * * The fact that an unproven charge has been made against one has no logical tendency to prove that he has been guilty of any offense, or to impair the credibility of his testimony. An indictment is a mere accusation, and raises no presumption of guilt. On the contrary, the indicted person is presumed to be innocent until his guilt is established, by legal evidence beyond a reasonable doubt, in a court of competent jurisdiction. It does not seem to be fairly open to question that he is deprived of the benefit of this presumption by the admission against him of evidence of the fact that a charge, based upon ex

parte evidence, which, when combated on a trial, may turn out to be utterly untrustworthy, has been made against him. It is not uncommon for entirely innocent persons to be indicted. It would be a gross injustice to permit the fact of such a making of a charge to be used to the prejudice of the person against whom the unproved charge is made. The evidence admitted over the objections made did not any more shed light on the question of the credibility of the defendant's testimony than it did upon the question of his guilt or innocence of the offense for which he was on trial. [Citations omitted.]"

■ Giving the cross-examiner in the case at bar the benefit of any doubt, we may charitably assume that at the outset of the cross-examination it was his intention to elicit from the defendant admissions of prior criminal convictions in his efforts to attack the defendant's credibility. Thus, he inquired of the defendant: "Q. Have you ever been caught and convicted of any offense since being here?" However, the form of this question was improper; such question should be specifically limited in scope to conviction of a particular offense.[4]

As the examination progressed, Government counsel pressed further and further into the areas which he must have known were clearly improper. Thus he asked:

"Q. How many times have you been arrested?

"A. I don't know. I admit my record.

"Q. You admit your record?

"A. That's right."

In Packineau v. United States, 202 F.2d 681, 688 (8th Cir., 1953), the court said:

"The prejudicial effect of such questioning of defendants concerning matters entirely irrelevant to

the issues is apparent. Questioning White Bear about his illegitimate family, *and multiplying questions to both defendants about their arrests for alleged disorderly conduct and petty misdemeanors necessarily prejudiced the jury against them. A conviction so obtained may not be sustained in this court."* (Emphasis supplied.)

Not content, however, with the answers thus far elicited from the defendant, Government counsel then proceeded to supply his own. Placing repeated emphasis upon the defendant's prior arrests, he asked:

"Q. Well, let me see, how about 30 times, would that sound about right?

"A. I don't know. You have got it down there.

"Q. Well, do you think it is any more than that?

"A. I don't know.

The attorney: "That's all."

■ This continued questioning constitutes a palpable abuse of the right of cross-examination. The *30 arrests* so interjected into the trial is without support or explanation in the record. In oral argument before us it was intimated that the list of the offenses which the prosecutor had in his hand during the cross-examination was partly, or even largely, made up of traffic offenses, evidence of which would have been inadmissible even though the arrests had been followed by convictions.

■ Rule 26, Fed.R.Crim.P., in pertinent part, provides:

" * * * The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

---

4. Cutshall v. United States, 252 F.2d 677, 679 (6th Cir., 1958); Riggs v. United

States, 280 F.2d 750, 754–55 (5th Cir., 1960).

At common law the inquiry was limited to felonies or crimes involving moral turpitude.[5] The rule ordinarily to be followed in this Circuit has been stated as follows: In criminal cases a witness may be asked, for purposes of impeachment, whether he has been convicted of a felony, infamous crime, petit larceny, or a crime involving moral turpitude.[6] By the prosecutor's one deft phrase, "30 times," the jurors were informed that the defendant, whose credibility they must determine, had been arrested 30 times, perhaps more. This cross-examination could have had no purpose other than to degrade the defendant and to arouse the prejudices of the jurors against him.

■ The Government insists that, even admitting that the cross-examination of the defendant was improper, it was not so prejudicial to the defendant as to constitute reversible error. But it is clear that here the primary issue for jury determination was the conflict between the testimony of Pennix, on the one hand, and that of the two self-confessed bank robbers, on the other. Thus, the credibility of witnesses was sharply brought into focus and any error which reflected upon or tended to impeach the credibility of the defendant may not be said to be insubstantial. In Salerno v. United States, 61 F.2d 419, 424 (8th Cir., 1932), where cross-examination of a defendant with regard to his prior arrests was involved, the court said:

"* * * When, in the prosecution of a defendant, counsel for the government indulges in unfair and improper cross-examination, the only purpose of which is to degrade the defendant and to prejudice the jury against him, the government, upon appeal, will not ordinarily be heard to say that the methods which were used did not have the effect which they were obviously intended to have. * * *"

To the same effect see Little v. United States, 93 F.2d 401, 408 (8th Cir., 1937), cert. denied, 303 U.S. 644, 58 S.Ct. 643, 82 L.Ed. 1105.

The error here was compounded when the District Court instructed the jury, "Where a witness admits he has a criminal record, you should take that into consideration * * * for the purpose of determining whether or not he is telling the truth * * *."

■ It is not our function to determine the guilt or innocence of the defendant nor to speculate upon probable reconviction in the event of a new trial. We cannot say, with fair assurance, that the verdict was not substantially influenced by the error. Again, see Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. We think that the errors here were so plain and so affected substantial rights as to be noticed by this court pursuant to Rule 52(b), Fed.R. Crim.P., even though they were not brought to the attention of the trial court. In all fairness, the defendant should be awarded a new trial.

The case will be remanded for further proceedings consistent with the views expressed herein.

Reversed and remanded.

---

5. Wigmore on Evidence, 3d Ed., §§ 980 (2) (a), 519, 520; Campbell v. United States, 85 U.S.App.D.C. 133, 176 F.2d 45 (1949); Henderson v. United States, 202 F.2d 400, 406 (6th Cir., 1953), cert. denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253.

6. Beaty v. United States, 203 F.2d 652, 657 (4th Cir., 1953); Simon v. United States, 123 F.2d 80, 86 (4th Cir., 1941), cert. denied, 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555. In each of these cases the court approved the rule as stated by the Tenth Circuit in Coulston v. United States, 51 F.2d 178.