30 F.3d 131
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Frederick Dean HAMILTON, Defendant-Appellant.
 No. 93-5393.
 United States Court of Appeals, Fourth Circuit.
 Argued: Feb. 10, 1994.
Decided: July 22, 1994.
 
 Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling. Frederick P. Stamp, Jr., Chief District Judge. (CR-92-173)
 Argued: John Preston Bailey, Bailey & Riley, L.C., Wheeling, WV, for appellant.
 Lisa Grimes Johnston, Asst. U.S. Atty., Wheeling, WV, for appellee.
 On brief: Alan G. McGonigal, Bailey & Riley, L.C., Wheeling, WV, for appellant.
 William D. Wilmoth, U.S. Atty., Wheeling, WV, for appellee.
 N.D.W.Va.
 AFFIRMED.
 Before RUSSELL and WILLIAMS, Circuit Judges, and OSTEEN, United States District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Appellant Frederick Dean Hamilton appeals his conviction for kidnapping to aid escape and related firearms offenses. Several issues, both evidentiary and sentencing, have been explored on appeal. The first issue involves the scope of the Government's cross-examination of Hamilton regarding specific details of his past criminal conduct. Because no objection was preserved on the record, our review is limited to plain error. Second, Hamilton raises two related issues regarding the proper scope of the Government's cross-examination of a defense character witness. Third, Hamilton objects to the scope of the Government's rebuttal testimony, again concerning his prior criminal conduct. We review these two issues applying the harmless error analysis.
 
 
 2
 Next, Hamilton raises the issue of whether he was sentenced properly as an armed career criminal which requires three prior violent felony convictions. The final issue is whether Hamilton's conviction and enhancement under 18 U.S.C. Sec. 922(g)(1) andSec. 924(e)(1) violate the double jeopardy clause in light of Hamilton's conviction as a felon in possession of a firearm in Oklahoma. As legal questions, we review the last two issues de novo. While we note our disapproval of the conduct of the Government in this case, we now affirm the district court on all issues.
 
 I.
 
 3
 On February 19, 1992, Hamilton, who was serving three life sentences, and two other inmates escaped from the West Virginia Penitentiary at Moundsville through a tunnel dug by the three inmates. After escaping, Hamilton separated from the other two inmates and eventually entered the home of Richard Porter in Benwood, West Virginia. At Porter's home, Hamilton seized control over two firearms belonging to Porter, a .38 caliber revolver and a Savage Model 24 over and under combination firearm, caliber .22 over.410 gauge. He was preparing to leave the home when Porter returned and surprised him. The record reflects that Hamilton restrained Porter at gunpoint, and several hours elapsed while Hamilton considered his escape from West Virginia.
 
 
 4
 After Porter's housemate returned to the home and determined something was amiss, Hamilton took Porter hostage, again at gunpoint, and forced him to drive Hamilton to Erie, Pennsylvania. When the two arrived in Erie, Hamilton left the vehicle, allowing Porter to escape unharmed. Hamilton then stole another vehicle and drove to El Reno, Oklahoma, where he attempted an armed robbery of a convenience store. Oklahoma authorities subsequently apprehended Hamilton. He was later tried and convicted of transporting a stolen vehicle, interference with commerce by threat, and related firearms charges in the United States District Court for the Western District of Oklahoma.
 
 
 5
 In July 1992, a federal grand jury sitting in the Northern District of West Virginia returned a three-count indictment against Hamilton charging him with kidnapping to aid an escape, possession and use of a firearm during the commission of a violent felony, and possession of a firearm by a convicted felon. At trial Hamilton proceeded pro se, occasionally receiving advice and assistance from standby counsel. His sole defense was that Porter was not a hostage, but that Porter voluntarily went with him to aid his escape. Hamilton was convicted on all counts on January 20, 1993, and sentenced as an armed career criminal to a total of 490 months imprisonment. The district court ordered the sentence to run concurrently with the sentence imposed by the Oklahoma federal district court. This appeal followed.
 
 II.
 
 6
 Hamilton first argues that the Government's cross-examination of him regarding his prior criminal conduct went beyond the realm of Rules 609(a) and 403 of the Federal Rules of Evidence to become more prejudicial than probative. Because neither Hamilton nor his standby counsel objected to the line of questioning by the prosecutor, our review is limited to plain error. Therefore, a new trial is required in this case only if the improper cross-examination of Hamilton amounted to such egregious error as to " 'affect the fairness, integrity or public reputation of judicial proceedings' " or a " 'miscarriage of justice would otherwise result.' " United States v. Mitchell, 1 F.3d 235, 239 (4th Cir.1993) (quoting United States v. Young, 470 U.S. 1, 15 (1985), and United States v. Frady, 456 U.S. 152, 163 n. 14 (1982)).
 
 
 7
 Hamilton does not contest the admissibility of his prior criminal record. However, Hamilton contends that the prosecutor's cross-examination went purposefully beyond the impeachment allowed by Rule 609 to recite heinous details of Hamilton's past conduct in order to inflame the jury against him.[1] The Government argues, however, that Hamilton placed his credibility at issue the moment he testified and that his often evasive manner of answering questions required the detail with which the prosecutor pursued his prior convictions.
 
 A.
 
 8
 First, we must decide whether error exists. We have previously determined in United States v. Pennix, 313 F.2d 524, 531 (4th Cir.1963), that when the critical issue for a jury's determination is the conflict between the testimony of a defendant and his accusers, then the scope of cross-examination of the defendant must be carefully monitored. In Pennix, the prosecutor first pursued the number of the defendant's prior criminal convictions, but ultimately forced the defendant to admit at least thirty prior arrests. We found the admission of that portion of the cross-examination to be error:
 
 
 9
 When, in the prosecution of a defendant, counsel for the government indulges in unfair and improper cross-examination, the only purpose of which is to degrade the defendant and to prejudice the jury against him, the government, upon appeal, will not ordinarily be heard to say that the methods which were used did not have the effect which they were obviously intended to have.
 
 
 10
 Id. at 531; see also United States v. Harding, 525 F.2d 84, 88-90 (7th Cir.1975) (holding that district court erred in allowing prosecutor to cross-examine defendant regarding where or how much marijuana was found in prior criminal conviction because not relevant to impeachment).
 
 
 11
 Like Pennix, the critical issue for the jury in this case was credibility--weighing the testimony of Hamilton against the testimony of Porter, the victim of the alleged kidnapping. To tip the balance of the credibility issue, the Government not only revealed Hamilton's prior convictions, but it pursued those convictions until every detail was placed before the jury. The jurors were not left to imagine the circumstances surrounding Hamilton's previous convictions for murder, armed robbery, and accessory to kidnapping--the details were depicted through the Government's questions.[2] The only inference to be drawn from the prosecutor's heated pursuit of Hamilton's criminal record was that Hamilton had committed deplorable crimes in the past and, thus, certainly could have committed the crimes charged.
 
 
 12
 The Fourth Circuit has also espoused the following principle:
 
 
 13
 Admission of evidence of a similar offense often does little to impeach the credibility of a testifying defendant while undoubtedly prejudicing him. The jury, despite limiting instructions, can hardly avoid drawing the inference that the past conviction suggests some probability that defendant committed the similar offense for which he is currently charged. The generally accepted view, therefore, is that evidence of similar offenses for impeachment purposes under Rule 609 should be admitted sparingly if at all.
 
 
 14
 United States v. Sanders, 964 F.2d 295, 297-98 (4th Cir.1992) (quoting Beahm, 664 F.2d at 418-19); see also United States v. Wilson, 556 F.2d 1177 (4th Cir.), cert. denied, 434 U.S. 986 (1977). The Government's repeated reference to Hamilton's prior accessory to kidnapping charge and prior escape attempt provides yet another basis to find error in the record, especially when the district court failed to give the proper limiting instruction regarding similar acts.
 
 
 15
 Finally, the references by the Government of Hamilton's prior accessory to kidnapping conviction were improper on still another ground. Although Hamilton did not raise the issue on appeal, we must note that Hamilton's prior convictions were presumptively inadmissible pursuant to the ten-year time limitation of Rule 609(b). All of Hamilton's past convictions elicited on cross-examination were sustained at least fourteen to fifteen years prior to trial. Rule 609(b) states that a conviction of more than ten years vintage is inadmissible unless the trial judge makes a specific finding that the probative value of the conviction substantially outweighs its prejudicial effect. Rule 609(b) further requires that the proponent of the admissibility of the vintage conviction must provide advance written notice of the intention to use such evidence. There is no evidence in the record indicating that these procedural safeguards were taken.
 
 
 16
 Likewise, we have upheld the import of Rule 609(b) and have " 'made it crystalline that the District Court was only to depart from the prohibition against the use for impeachment purposes of convictions more than ten years old very rarely and only in exceptional circumstances.' " United States v. Beahm, 664 F.2d 414, 417 (4th Cir. 1981) (quoting United States v. Cavender, 578 F.2d 528, 530 (4th Cir.1978)). Here, as in Beahm and Cavender, the district court failed to make any specific finding that the probative value of the convictions substantially outweighed the prejudicial effect of admission. Even had there been a finding by the trial court, the details of the circumstances surrounding Hamilton's prior convictions for murder, armed robbery, or malicious wounding would not have been probative of his veracity. Therefore, we now find that the district court erred in allowing the Government to probe so deeply into the circumstances surrounding Hamilton's prior convictions.
 
 B.
 
 17
 Having found error, we must now determine whether the error was so egregious that a miscarriage of justice would result without reversal. Mitchell, 1 F.3d at 239. After a review of the entire record, we do not find plain error.
 
 
 18
 The direct and very credible evidence by the kidnapping victim was overwhelming. Porter testified that he opened the front door into his home to have a hyperactive Hamilton shove a Savage Model 24 over and under in his face. Hamilton immediately restrained Porter, and when Porter attempted to deceive Hamilton by denying the existence of other firearms in the home, Hamilton slapped Porter and waved a .38 revolver in his face. Porter also testified that after he screamed to his housemate to "Run!," Hamilton then rushed Porter to his vehicle at gunpoint and demanded that he drive Hamilton across the state line. Porter told the jury that the .38 revolver was a constant presence during the journey to Erie, Pennsylvania, where Hamilton finally released Porter and stole another vehicle. There is no doubt that Porter's testimony alone supported jury convictions on the kidnapping and firearms charges.
 
 
 19
 The unfortunate reality is that the Government did not need to pursue Hamilton's prior criminal offenses with the vengeance portrayed in the United States Attorney's questioning of Hamilton, his witnesses, and the Government's rebuttal witness. Without the sordid details of Hamilton's past, the jury had two versions of the same event from which to decide a basic credibility issue: (1) the short, unexaggerated, and unimpeachable story of the kidnapping victim and (2) the incredulous tale of civic generosity told by the escaped convict already serving three life sentences for violent crimes.[3] Therefore, although we find that the Government's overzealous cross-examination caused error in the record, we do not hold that such error was so egregious as to cause a miscarriage of justice. In fact, there is substantial evidence in the record to show that justice was served by the jury's verdict.
 
 III.
 
 20
 Hamilton next argues the district court abused its discretion in permitting the Government to cross-examine his character witness, Father Ronan J. Deegan, regarding specific details of Hamilton's past criminal behavior. Hamilton concedes that Rule 405 allows the Government to ask character witnesses about their knowledge of a defendant's specific acts. However, Hamilton raises two objections to the scope of the Government's cross-examination of Father Deegan. First, Hamilton argues that the Government moved beyond an attempt to shake Father Deegan's basis for his opinion and began reciting heinous details of Hamilton's past criminal conduct for the purpose of prejudicing the jury. Second, Hamilton contends that when Father Deegan indicated he had no knowledge of the events, the Government was foreclosed from further inquiry.[4] Although the Government conceded at oral argument that it might be guilty of overzealous advocacy, it denied any error in view of Hamilton's own cross-examination and the remaining evidence supporting conviction.
 
 
 21
 We will address both of Hamilton's contentions. First, the district court's governance of the scope of cross-examination will not be disturbed absent a clear abuse of discretion. Michelson v. United States, 335 U.S. 469, 480 (1948). The Fourth Circuit has defined the parameters of cross-examination of defense character witnesses as follows:
 
 
 22
 Of course, the prosecutor is free upon cross-examination to inquire of the defendant's reputation witnesses whether they have heard particular rumors about the defendant or have heard about specific instances of misconduct on his part but such inquiries are for the purpose of revealing inconsistencies between what the witness has heard and the conclusion about the defendant's reputation which the witness expressed upon direct examination, and not for the purpose of proving the defendant's bad reputation.
 
 
 23
 United States v. Curry, 512 F.2d 1299, 1305 (4th Cir.) (emphasis added) (reversing and granting a new trial on the basis of improper rebuttal testimony), cert. denied, 423 U.S. 832 (1975).
 
 
 24
 Other circuits have focused on restricting the purpose of the prosecutor's use of specific acts and have suggested that a limiting instruction to the jury will dispel possible prejudice. See, e.g., United States v. Roenigk, 810 F.2d 809, 814-16 & 816 n. 2 (8th Cir.1987) (holding that excessive exploration of the details of defendant's drug-related conduct was prejudicial where defendant was on trial for perjury and no limiting instruction was given). Courts have further suggested that sidebars be required to ascertain whether the prosecutor has a good faith basis for his inquiry and whether the specific act is relevant to the character trait involved at trial. See, e.g., United States v. Wallach, 935 F.2d 445, 472 (2d Cir.1991) (finding error in allowing prosecutor to cross-examine defendant's character witnesses regarding defendant-attorney's unethical behavior in keeping $1 million of $1.7 million settlement in personal injury case where district court did not engage in a sidebar to determine relevancy), cert. denied, --- U.S. ----, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993); United States v. Frost, 914 F.2d 756, 772 (6th Cir.1990) (finding no abuse of discretion by district court in allowing prosecutor to question defendant's character witnesses regarding defendant's failure to report income or cheating clients when district court held sidebar to determine factual basis and relevancy); United States v. Wells, 525 F.2d 974, 977 (5th Cir.1976) (finding no abuse of discretion where the trial judge ascertained outside the presence of the jury whether prosecutor had good faith basis for inquiries and trial judge then revealed to counsel he would instruct the jury to limit its consideration of the prior misconduct).
 
 
 25
 These cases define the procedural parameters of allowing inquiry into a defendant's prior criminal record to test the reputation testimony of a defense character witness. The following judicial mechanisms may dispel potential prejudice to a defendant: an inquiry into the Government's good faith basis for admission, a Rule 403 relevancy determination, and a contemporaneous limiting instruction to the jury. None of these procedural safeguards were applied in this case. As a result, the Government's inquiry moved beyond an attempt to shake Father Deegan's reputation testimony to an attempt to prejudice the jury.
 
 
 26
 In fact, the Government's continuing supplementation of facts surrounding Hamilton's convictions grew more prejudicial with each question. Ultimately, the Government was allowed to ask whether Father Deegan was aware of a victim's hysterical reaction to one of Hamilton's crimes. Even taken in the light most favorable to the Government, such a question has no basis in our rules of evidence.
 
 
 27
 Hamilton also argues that the district court erred in allowing the Government to continue questioning Father Deegan about the details of his prior conduct when the witness indicated he had no knowledge of the events. We have spoken indirectly on this issue in a case disapproving guilt-assuming hypothetical questions posed to a defendant's character witness on cross-examination. See United States v. Siers, 873 F.2d 747 (4th Cir.1989), cert. denied, --- U.S. ----, 113 S.Ct. 1064, 122 L.Ed.2d 369 (1993). We noted that:
 
 
 28
 [T]he permissible inquiry on such cross examination of a character witness [is] whether the witness has heard of a fact that is likely to have caused a negative community impression of the defendant. If the witness has not heard of the fact, that is the end of the inquiry, and asking the witness to assume the fact simply has no place in the case.
 
 
 29
 Id. at 749 (emphasis added). Hamilton argues that there could be only two possible reasons that the prosecutor continued his inquiry: either to imply that the witness should assume the facts contained in the question, or to simply review the sordid facts for the benefit of the jury.
 
 
 30
 Irrespective of Father Deegan's negative responses, the Government informed the jury through its questions that Hamilton had the wife of a mayor of a small town kidnapped, plotted to murder rather than release her, and in fact, had her murdered in "cold blood." (J.A. at 19-20.) None of these facts were corroborated by any other witness. In fact, no other witness could have properly testified to those facts except Hamilton himself. He denied those accusations. Therefore, when the witness indicated that he had no knowledge of the prior kidnapping, the inquiry should have ended. Thus, the district court abused its discretion by allowing the Government to continue its inquiry with greater detail when the witness asserted no knowledge of the events. However, as discussed below, while the error was not blameless, it was harmless.
 
 IV.
 
 31
 Hamilton's final evidentiary objection is to the testimony of the Government's rebuttal witness, Captain John Bragg. Hamilton contends that Captain Bragg was allowed to testify in lengthy detail about Hamilton's prior criminal record, rather than simply to rebut Hamilton's general reputation witnesses. The district court properly sustained early objections to Captain Bragg's tendency to pontificate on Hamilton's prior bad acts. However, Captain Bragg continued to relate conversations he had with Hamilton and other individuals regarding Hamilton's prior escape attempts and other criminal activity. Construing the early objections as standing objections, we now review for abuse of discretion.
 
 
 32
 The Fourth Circuit has spoken directly to the scope of rebuttal testimony:
 
 
 33
 Where the prosecution seeks through its own rebuttal witnesses to challenge the defendant's evidence of his own good general reputation it is limited to showing his bad general reputation.... While narrow questions about specific traits of the accused are proper rebuttal in some circumstances, the prosecution is not permitted to elicit testimony from its own rebuttal witnesses concerning specific traits of the defendant for the sole purpose of repudiating the defendant's evidence of his general reputation.
 
 
 34
 United States v. Curry, 512 F.2d 1299, 1305 (4th Cir.) (finding that the district court erred in allowing rebuttal witness to testify that he had information the accused was dealing in drugs), cert. denied, 423 U.S. 832 (1975). Curry is consistent with the language of Rule 405 which allows the inquiry into specific instances of conduct only on cross-examination.
 
 
 35
 Father Deegan and Hamilton's other character witnesses testified as to Hamilton's reputation in the environment in which the witness had observed him. As the Curry decision makes clear, the Government could have rebutted Hamilton's reputation testimony with narrow questions concerning specific instances of conduct, but only for the purpose of repudiating Hamilton's general reputation. The Government went much further, however. Captain Bragg was allowed to elaborate in great detail regarding Hamilton's prior criminal conduct including, but not limited to, various conversations he had with individuals other than Hamilton. This testimony was clearly beyond the scope of rebuttal, and, thus, its admission was error.
 
 V.
 
 36
 Having found error in the record with regard to the cross-examination of Father Deegan and the rebuttal testimony of Captain Bragg, our inquiry turns to determining whether each evidentiary error affected substantial rights or was simply harmless. 28 U.S.C. Sec. 2111; Fed.R.Crim.P. 52. To affirm the district court, we must believe it highly probable that the errors did not affect the judgment. The standard adopted by the Fourth Circuit for nonconstitutional error is "whether we can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.' " United States v. Nyman, 649 F.2d 208, 211-12 (4th Cir.1980) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)). The Nyman court further found that the decisive factors in determining harmless error were " 'the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.' " Id. at 212 (quoting Gaither v. United States, 413 F.2d 1061, 1079 (D.C.Cir.1969)).
 
 
 37
 This simply was not a close case. Without stripping away each of the two errors at issue, the Government's case centered on the powerful, virtually unimpeachable testimony of Hamilton's kidnapping victim. As discussed above, Porter testified in detail regarding his abduction. He described how Hamilton threatened him with the Savage Model 24 over and under and, in fact, struck him on at least one occasion. Porter further testified that Hamilton forced him to drive a certain route to Erie and that Hamilton was constantly displaying the .38 revolver during the trip. This testimony alone is enough to support convictions on all counts.
 
 
 38
 Because the credibility of Porter and Hamilton became the central issue for the jury, we must note that the zeal with which the Government pursued Hamilton's criminal record throughout the questioning of Father Deegan and Captain Bragg should be viewed with great caution. However, Porter's testimony remained unshaken. To the contrary, Hamilton's testimony that Porter suddenly volunteered to aid Hamilton's escape because Porter had a previous bad experience with law enforcement was not credible, if not simply unbelievable. There is no doubt that the Government could have properly introduced Hamilton's vast and violent criminal history at trial. Consequently, without stripping the errors from the record, there was ample evidence to discredit Hamilton's version of the kidnapping and to support conviction. Therefore, we find that the conduct of the Government and the resulting errors in the record, while unnecessary and quite alarming, are harmless given the overwhelming and credible direct evidence against Hamilton.
 
 VI.
 
 39
 Hamilton next argues that his sentencing enhancement status as an armed career criminal is inappropriate because he has not been convicted of three prior violent felonies which were "committed on occasions different from one another." 18 U.S.C.Sec. 924(e)(1); see also U.S.S.G. Sec. 4B1.4. Defendant concedes that he has been convicted of at least two prior violent felonies arising out of two different series of violent criminal activity on or about October 14, 1977, and January 25, 1978.[5] He contests, however, that there is a third prior violent felony conviction which would justify his being sentenced as an armed career criminal.
 
 
 40
 The Government offers a May 19, 1992, conviction for interference with commerce by threat as Hamilton's third prior violent felony conviction. The conviction involved an attempted armed robbery of a convenience store in El Reno, Oklahoma, actually committed on February 26, 1992, several days after his escape from the West Virginia Penitentiary and two days after the commission of the instant offenses. The Government contends and the district court concluded that the attempted armed robbery in Oklahoma was a separate criminal episode from Hamilton's abduction of Porter in West Virginia. We agree.
 
 
 41
 In 1990, we joined a host of other circuits interpreting Sec. 924(e) and concluded that " 'previous convictions' meant previous criminal episodes that were distinct in time, rather than multiple, 'literal' convictions that might result from a 'single spasm of criminal activity.' " United States v. Blackwood, 913 F.2d 139, 146 (4th Cir.1990) (finding that two drug offenses, committed two hours apart equals same criminal episode warranting only one conviction for sentencing purposes); see also United States v. Tisdale, 921 F.2d 1095, 1099 (10th Cir.1990) (holding that burglary of two businesses on same night were separate criminal transactions for enhancement purposes), cert. denied, --- U.S. ----, 112 S.Ct. 596, 116 L.Ed.2d 619 (1991); United States v. McDile, 914 F.2d 1059, 1061 (8th Cir.1990) (finding that drug charges indicted together, but committed over a period of two months were separate predicate offenses for sentencing purposes), cert. denied, 498 U.S. 1100 (1991); United States v. Potter, 895 F.2d 1231, 1235-37 (9th Cir.) (concluding that two robberies at two different locations involving two separate victims on the same night equal two distinct felony convictions), cert. denied, 497 U.S. 1008 (1990); United States v. Towne, 870 F.2d 880, 891 (2d Cir.) (holding that kidnapping and sexual assault upon a single victim over prolonged period of time was same criminal episode warranting only one conviction for sentencing purposes), cert. denied, 490 U.S. 1101 (1989); United States v. Gillies, 851 F.2d 492, 497 (1st Cir.) (observing that two robberies of two different drug stores on two different days equal two felony convictions, but two burglaries of the same house equal one felony for sentencing purposes), cert. denied, 488 U.S. 857 (1988); United States v. Greene, 810 F.2d 999, 1000 (11th Cir.1986) (finding that four burglaries of four separate buildings on four separate occasions equal four felonies for sentencing purposes).
 
 
 42
 Several critical factors in determining separate episodes of criminal activity are whether there are different victims or property targets, whether there are temporal lapses in criminal activity, and whether there are substantial geographical disparities. Although Hamilton's conviction for interference with commerce by threat arose immediately after his escape and flight from the West Virginia Penitentiary, the offense did not further the escape, as did the abduction of Porter. Thus, the kidnapping in West Virginia and the attempted armed robbery in Oklahoma served substantially different purposes. Furthermore, the offenses were committed against different victims and in locations separated by over a thousand miles. All of these factors support the conclusion that the instant offenses and the conviction for interference with commerce by threat were separate criminal episodes "committed on occasions different from one another." 18 U.S.C. Sec. 924(e)(1).
 
 
 43
 At oral argument, Hamilton raised a novel contention which we deem necessary to address. Hamilton asserts that the conviction for interference with commerce by threat cannot serve as a prior violent felony conviction because the offense actually was committed after the offenses of conviction currently on appeal. Hamilton argues that it is irrational for a recidivist enhancement to apply to an offense which was committed after the crime charged.
 
 
 44
 In support of his argument, Hamilton contends we should apply the definition of "two prior felony convictions" pursuant to the career offender enhancement provision of the Sentencing Guidelines, U.S.S.G. Sec. 4B1.2. He claims the relevance of that definition in light of the absence of a definition of "three previous convictions" in the Armed Career Criminal Act, 18 U.S.C. Sec. 924(e)(1), or its sentencing counterpart, U.S.S.G. Sec. 4B1.4. For the purposes of determining career offender status, " 'two prior felony convictions' means (A) the defendant committed the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. Sec. 4B1.2(3). Under Hamilton's theory, his conviction for interference with commerce by threat could not survive as his third prior felony conviction because he committed the instant kidnapping and firearms offenses before committing the attempted robbery and, certainly, before sustaining a conviction for the attempted robbery.
 
 
 45
 While we recognize the novelty and creativity of Hamilton's argument, we cannot accept the theory that the guideline career offender enhancement and the statutory armed career criminal enhancement are identical in nature or enforcement. The Sentencing Guidelines note the following critical differences between the two enhancement provisions:
 
 
 46
 It is to be noted that the definitions of "violent felony" and "serious drug offense" in 18 U.S.C. Sec. 924(e)(2) are not identical to the definitions of "crime of violence" and "controlled substance offense" used in Sec. 4B1.1 (Career Offender), nor are the time periods for the counting of prior sentences under Sec. 4A1.2 (Definitions and Instructions for Computing Criminal History) applicable to the determination of whether a defendant is subject to an enhanced sentence under 18 U.S.C. Sec. 924(e).
 
 
 47
 U.S.S.G. Sec. 4B1.4 applic. n. 1. The application note indicates there are differences in the calculation of prior sentences between the career offender enhancement and the armed career criminal enhancement. The primary difference is that armed career criminal status is not governed by standard guideline calculations. See United States v. Maxey, 989 F.2d 303, 308 (9th Cir.1993) (the guidelines do not displace Sec. 924(e) and the case law interpreting it).
 
 
 48
 The United States Sentencing Commission attempted to clarify the distinction in a subsequent training publication:
 
 
 49
 In addition, the three previous convictions that qualify a defendant for armed career criminal status under section 924(e) are counted irrespective of when they were sustained and whether or not they would be considered 'related' within the meaning of Sec. 4A1.2 (Definitions and Instructions for Computing Criminal History). In contrast, prior sentences under the career offender guideline (Sec. 4B1.1-4B1.2) are controlled by the time limits and other rules applicable to the counting of prior sentences set forth in Sec. 4A1.2.
 
 
 50
 United States Sentencing Commission, Most Frequently Asked Questions About the Sentencing Guidelines 27 (6th ed. Dec.1992) (emphasis added). The language of the training publication further emphasizes that the career offender enhancement and the armed career criminal enhancement do not have comparable mechanisms for calculating previous felony convictions. More importantly, the publication makes clear that previous convictions for armed career criminal status "are counted irrespective of when they were sustained." Id. See also United States v. Lujan, 9 F.3d 890, 893 (10th Cir.1993) (section 4A1.2 time limits for prior convictions do not apply to armed career criminal status). This language supports the conclusion that armed career criminal status is much broader than career offender status, and, necessarily, the term "three previous convictions" is less strictly construed.
 
 
 51
 Consequently, we find that Hamilton was sentenced appropriately as an armed career criminal. Although the offense of interference with commerce by threat actually was committed two days after the instant offenses, Hamilton was convicted of that offense nearly eight months before his jury trial in this matter. Continuing to engage in two separate episodes of violent criminal activity and to possess firearms to further that activity after having been previously convicted of violent crimes manifests a propensity for recidivism which the armed career criminal status was designed to punish.
 
 VII.
 
 52
 Finally, Hamilton contends his conviction for possession of a firearm as a convicted felon violates the Double Jeopardy Clause of the Fifth Amendment. In the course of Hamilton's abduction of Porter, Hamilton seized two firearms from Porter's home: a Savage Model 24 over and under and a .38 revolver. Hamilton used the Savage Model 24 to restrain Porter initially in West Virginia, while he used the revolver during the drive to Pennsylvania and even later in an attempted robbery in El Reno, Oklahoma. The possession of the Savage Model 24 is the basis for the Sec. 922(g) conviction in this case. However, Hamilton was also convicted in the Western District of Oklahoma as a felon in possession of the .38 revolver in violation of Sec. 922(g). Hamilton claims that two firearms acquired simultaneously can be the basis of only one conviction under Sec. 922(g).
 
 
 53
 The Fourth Circuit addressed this issue in the context of 18 U.S.C. Sec. 1202(a), the predecessor statute to Sec. 922(g):[6]
 
 
 54
 Although the two guns were seized together, logic and the scheme of Sec. 1202(a) strongly suggest that his acts of possession may not be viewed in a frozen, momentary state immediately prior to the seizure. The answer to the question whether there was one possession of the two guns or two possessions is to be found in the course of his treatment of the firearms. A momentary possession may be a violation of the statute, but the character of the possession is to be found in the possessor's course of conduct.
 
 
 55
 United States v. Mullins, 698 F.2d 686, 687 (4th Cir.) (emphasis added) (holding that a firearm used in employment security and a firearm kept for personal use supported two separateSec. 1202(a) convictions), cert. denied, 460 U.S. 1073 (1983). Thus, the critical issue is whether "the evidence sufficiently showed [Hamilton's] disparate course of dealing with the two weapons." Id. at 688.
 
 
 56
 While it is true the two firearms were acquired by Hamilton simultaneously, the record reveals that their use was quite different. In the instant Sec. 922(g) charge, Hamilton used the Savage Model 24 to detain Porter in his home in West Virginia. However, Hamilton's conviction of possession of the .38 revolver under Sec. 922(g) in the Western District of Oklahoma was predicated upon an attempted robbery which resulted in his conviction for interference with commerce by threat.
 
 
 57
 Thus, Hamilton's treatment of the two firearms was disparate, justify ing his conviction in West Virginia and Oklahoma of two guns acquired simultaneously,[7] but utilized in two different episodes of criminal activity. We find, therefore, no violation of the Double Jeopardy Clause.
 
 VIII.
 
 58
 For the reasons stated herein, the judgment of the district court is affirmed.
 
 
 59
 AFFIRMED.
 
 
 
 [1]
 The initial questions posed to Hamilton regarding each of his past convictions are as follows:
 Q. Did you find God before or after you attempted to kill the car salesman?
 ....
 Q. All right. Did you find God before or after you murdered Trooper Brown?
 ....
 Q. All right. Did you find God before or after you had Mrs. Cooper murdered in cold blood?
 ....
 (J.A. 67-68.) The prosecutor then questioned Hamilton in great detail concerning each of those events. An example of the detail with which the prosecutor pursued Hamilton's past convictions is as follows:
 Q. Mr. Porter wasn't the first person that you had confined during an attempt for you to escape, is he?
 A. I don't know.
 Q: Well, you had Mrs. Ima Mae Cooper kidnapped as part of an escape plan, didn't you?
 A. No.
 Q. You didn't? Did you plan to murder Mrs. Cooper?
 A. No. Q. You had her taken as a hostage while you were in the Tucker County Jail, didn't you?
 A: No.
 Q. Didn't you plan with your friend, David Mills, who was just released from jail, that he would take her as a hostage, that he would--did you plan that?
 A. No.
 Q. Did you plan with Mr. Mills, that Mr. Mills would abduct Mrs. Cooper, that he would call the newspapers and ransom Mrs. Cooper for your release together with $10,000, a four-wheel-drive vehicle equipped with a radio transmitter, and a 48-hour head start?
 A. No, on all of those.
 Q. You didn't do any of that? Mrs. Cooper was murdered by Mr. Mills, wasn't she?
 A. Yes.
 Q. He shot her in the back twice, didn't he?
 A. My understanding, yes.
 Q. Then he blew her head off.
 A. I don't know.
 (J.A. 76-77.)
 
 
 [2]
 Moreover, we have previously stated that "[i]n proving the felony conviction on cross-examination, the United States Attorney may 'ask about the name of the crime, the time and place of conviction, and the punishment.' " United States v. Boyce, 611 F.2d 530, 530 (4th Cir.1979) (per curiam ). Thus, the traditional inquiry on cross-examination does not entail the sordid detail with which the Government pursued Hamilton's past felony convictions
 
 
 [3]
 Hamilton testified that Porter not only wanted to cooperate, but also wanted to assist Hamilton in his escape. Hamilton claimed that Porter offered to take him to Pittsburgh where he could disappear into a large crowd. Hamilton also asserted that the two were waiting for Porter's housemate to return so that he could be with Porter during the journey. Finally, Hamilton testified that the two men parted ways in Erie after a friendly handshake. (J.A. at 189-95.)
 
 
 [4]
 The relevant testimony is as follows:
 Q. Have you heard that in a second escape attempt, he had the wife of a mayor of a small town kidnapped?
 A. [Father Deegan] I didn't hear that.
 THE DEFENDANT: I object, your Honor.
 THE COURT: Objection is overruled.
 THE DEFENDANT: Okay.
 Q. Did you hear that the plan was to have this woman murdered even before she was exchanged as a hostage for Mr. Hamilton?
 THE DEFENDANT: I object, your Honor. He is stating the situation different than what it was.
 THE COURT: Well, you may cover that in direct examination or otherwise. I will overrule your objection, Mr. Hamilton.
 THE DEFENDANT: Thank you.
 A. No, I didn't hear that.
 Q. Have you heard that the woman was actually murdered in cold blood?
 A. I knew there was a woman murdered, yes.
 ...
 Q. Did you know that after the defendant escaped from custody, he attempted to rob a gas station in Oklahoma?
 A. Yes, I read that.
 Q. Did you hear that he used a revolver to do that?
 A. Yes, he started to, I heard.
 Q. He started to what?
 A. To use a revolver, but he backed off.
 Q. Did you hear that when the woman was confronted with the gun, she panicked so badly she started beating on the window and screaming even though she was facing a loaded weapon?
 A. Yes.
 (J.A. 19-20.)
 
 
 [5]
 Hamilton was convicted of armed robbery, aiding and abetting murder, and accessory to kidnapping arising out of activity occurring on October 14, 1977. He was also convicted of murder, armed robbery, and malicious wounding arising out of activity occurring on January 25, 1978
 
 
 [6]
 The offense of a felon in possession of a firearm was previously codified at 18 U.S.C. Sec. 1202(a) and has been amended and recodified at 18 U.S.C. Sec. 922(g)
 
 
 [7]
 The single acquisition of the two firearms is not enough to sustain Hamilton's double jeopardy claim. Hamilton cites two cases which discuss the double jeopardy implications of imposing multiple sentences under 18 U.S.C. Sec. 924(c). See United States v. Smith, 924 F.2d 889, 894 (9th Cir.1991); United States v. Henning, 906 F.2d 1392, 1398-99 (10th Cir.1990), cert. denied, 498 U.S. 1069, (1991). Hamilton cites Smith and Henning for the proposition that a convicted felon in possession of two firearms can only be subject to one sentence enhancement. These cases do not present the same issue relevant to our Sec. 922(g) double jeopardy determination. However, even if these cases were applicable, they would support the same conclusion that no double jeopardy violation occurred. Both Smith and Henning conclude that where there are two separate predicate offenses, such as kidnapping in West Virginia and attempted robbery of a separate victim in Oklahoma, then both firearms charges stand. Smith, 924 F.2d at 894; Henning, 906 F.2d at 1398-99